IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

JOHN LAGE, and
MARIA MANTILLA,

    Plaintiffs,

vs.

OCWEN LOAN SERVICING, LLC.,
A Florida Limited Liability Company,

    Defendant.
_____/

## COMPLAINT FOR DAMAGES

Plaintiffs John Lage and Maria Mantilla sue Defendant Ocwen Loan Servicing LLC and allege:

## THE PARTIES, JURISIDICTION, AND VENUE

1.    Plaintiffs John Lage and Maria Mantilla are natural persons over the age of 21. They are citizens of the State of Florida and reside in Palm Beach County, Florida. Plaintiffs will be referred to hereafter as "Borrowers."

2.    Defendant Ocwen Loan Servicing LLC is a limited liability company whose sole member is Ocwen Financial Corporation, a Florida corporation with its principal place of business in the state of Florida. Accordingly, Defendant Ocwen Loan Servicing LLC is a citizen of the State of Florida for diversity purposes. Defendant Ocwen Loan Servicing LLC is engaged in the business of servicing federally related mortgage loans secured by real property throughout the United States and the State of Florida. This Defendant will be referred to hereafter as "Servicer." As a mortgage servicer, it is subject to specific federal laws and administrative

regulations governing its mortgage serving activities. These laws and regulations include, but are not limited to, the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et. seq*. (hereinafter RESPA) and Regulation X, 12 C.F.R part 1024, hereinafter "Regulation X."

3. At all material times, Servicer serviced Borrowers' mortgage loan secured by real property located in Palm Beach County, Florida.  Servicer engages in substantial business activity in the State of Florida and the territorial jurisdiction of this Court. Servicer also maintains a large facility in the City of West Palm Beach, Florida.  Accordingly, Servicer is subject to this Court's jurisdiction.

4. Borrowers assert claims against Servicer under the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2601 *et. seq*., a federal statute.  Accordingly, 28 USC § 1331 provides this court with subject matter jurisdiction.  Borrowers also assert claims for negligence under the common law of the State of Florida.  Because Borrowers' claims arise from the same transaction and occurrence as the RESPA claim,  this Court has supplemental jurisdiction under 28 USC § 1367 to adjudicate the state law negligence claim.

5. All of the acts and omissions that rise to this lawsuit either occurred in Palm Beach County, Florida or relate to real property and other business transactions located in Palm Beach County, Florida.  Accordingly, venue is proper in this Court.

## GENERAL ALLEGATIONS

6. Borrowers own a home located in Boynton Beach, Florida.  This home is subject to a first mortgage lien that was created as a result of a transaction that was consummated on July 14th, 2006.  That mortgage loan is currently serviced by Servicer.  However, Servicer does not, and never has, owned that loan.  The loan that gives rise to this lawsuit is a federally related mortgage loan as defined by 12 U.S.C. §2602.

7. As a mortgage servicer, Servicer is engaged in handling accounting, customer service, collection, and virtually all other services related to managing the residential mortgage loans in its portfolio. For all practical purposes, Servicer and other mortgage servicers generally appear to the borrowers whose loan they service as the mortgagee or "lender." However, Servicer has never loaned Borrowers any money, purchased their mortgage debt, nor engaged in any other activities that give rise to any relevant debtor/creditor relationship. Rather, Servicer simply services Borrowers' mortgage loans, and many other mortgage loans, as a contracted agent acting on behalf of the mortgagee/investor that actually owns the loan. Thus, there is neither a contractual relationship, nor a debtor/creditor relationship between Borrowers and Servicer.

8. In its final rule and official interpretations implementing the recently amended version of Regulation X, the Consumer Financial Protection Bureau describes the mortgage servicing industry as follows: [1]

> [m]ortgage servicing is performed by banks, thrifts, credit unions, and non-banks under a variety of business models. In some cases, creditors service mortgage loans that they originate or purchase and hold in portfolio. Other creditors sell the ownership of the underlying mortgage loan, but retain the mortgage servicing rights in order to retain the relationship with the borrower, as well as the servicing fee and other ancillary income.
>
> In still other cases, servicers have no role at all in origination or loan ownership, but rather purchase mortgage servicing rights on securitized loans or are hired to service a portfolio lender's loans. These different servicing structures can create difficulties for borrowers if a servicer makes mistakes, fails to invest sufficient resources in its servicing operations, or avoids opportunities to

---

[1] The text of this paragraph, as well as paragraphs     is quoted from the Final Rule and Official Interpretations promulgated by the Consumer Financial Protection Bureau, pages 14-17 Available at http://files.consumerfinance.gov/f/201301_cfpb_final-rule_servicing-respa.pdf (Last Visited on December 4th, 2014)

work with borrowers for the mutual benefit of both borrowers and owners or assignees of mortgage loans.

***

Contracts between the servicer and the mortgage loan owner specify the rights and responsibilities of each party… servicer contracts govern servicer requirements to advance payments to owners of mortgage loans, and to recoup advances made by servicers, including from ultimate recoveries on liquidated properties.

Compensation structures vary somewhat for loans held in portfolio and securitized loans, but have tended to make pure mortgage servicing (where the servicer has no role in origination) a high-volume, low-margin business. Such compensation structures incentivize servicers to ensure that investment in operations closely tracks servicer expectations of delinquent accounts, and an increase in the number of delinquent accounts a servicer must service beyond that projected by the servicer strains available servicer resources. A servicer will expect to recoup its investment in purchasing mortgage servicing rights and earn a profit primarily through a net servicing fee (which is typically expressed as a constant rate assessed on unpaid mortgage balances), interest float on payment accounts between receipt and disbursement, and cross-marketing other products and services to borrowers. Under this business model, servicers act primarily as payment collectors and processors, and will have limited incentives to provide other customer service. Servicers greatly vary in the extent to which they invest in customer service infrastructure. For example, servicer staffing ratios have varied between approximately 100 loans per full-time employee to over 4,000 loans per full time employee. Servicers are generally not subject to market discipline from consumers because consumers have little opportunity to switch servicers. Rather, servicers compete to obtain business from the owners of loans—investors, assignees, and creditors—and thus competitive pressures tend to drive servicers to lower the price of servicing and scale their investment in providing service to consumers accordingly.

Servicers also earn revenue from fees assessed on borrowers, including fees on late payments, fees for obtaining force-placed insurance, and fees for services, such as responding to telephone inquiries, processing telephone payments, and providing payoff statements. As a result, servicers have an incentive to look for opportunities to impose fees on borrowers to enhance revenues. These attributes of the servicing market created problems for

> certain borrowers even prior to the financial crisis. For example, borrowers experienced problems with mortgage servicers even during regional mortgage market downturns that preceded the financial crisis. There is evidence that borrowers were subjected to improper fees that servicers had no reasonable basis to impose, improper force-placed insurance practices, and improper foreclosure and bankruptcy practices.

9. Borrowers fell behind on their mortgage payments, which ultimately led to the filing of a foreclosure lawsuit against them in the 15th Judicial Circuit in and for the State of Florida. A foreclosure judgment was entered against Borrowers and in favor of non-party GMAC Mortgage LLC on March 14th, 2014.

10. Sometime prior to January 28th, 2014, Borrowers submitted a loss mitigation application to Servicer. Then, on January 28th, 2014, a state court judge presiding over the foreclosure rescheduled the foreclosure sale date for March 14th, 2014.

11. The sale was rescheduled to a date more than 37 days after the loss mitigation application was received. Accordingly, "Borrowers" application was subject to all of the recently amended provisions of 12 C.F.R. §1024.41 found in Regulation X. Accordingly, Servicer was required to evaluate the loss mitigation application within 30 days. However, Servicer failed to do so.

12. Instead, on or about March 9th, 2014, more than 30 days after receiving Borrowers' loss mitigation application, Servicer sent Borrowers a letter denying their loss mitigation application simply because, at the time of the denial letter, there was a sale scheduled less than 7 business days in the future.

13. On September 4th, 2014, Borrowers, through counsel, sent Servicer a Qualified Written Request/Notice of Error placing Servicer on notice that it failed to comply with 12 C.F.R. §1024.41, and specifically invoking the error resolution procedures established by

RESPA and Regulation X .  A true and correct copy of that letter is attached hereto as Exhibit "A." This exhibit incorporates Servicer's March 9th, 2014 letter referenced in Paragraph 11 above.

14. Although Servicer invoked the provision of Regulation X permitting it to extend the 30 business day deadline by an additional 15 days to respond to Borrowers' Qualified Written Request/Notice of Error,  Servicer has never substantively responded to that correspondence.

15. At no point in time did Servicer ever acknowledge Borrowers' loss mitigation application or request any additional documentation or information in support of Borrowers' loss mitigation application.

## COUNT I – VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT AND IMPLEMENTING REGULATION X

16. Borrowers re-allege and incorporate by reference the allegations in Paragraphs 1 through 15 above.

17. Pursuant to Section 12 C.F. R. §1024.41, when a mortgage servicer receives a loss mitigation application at least 37 days before a scheduled foreclosure sale, that servicer must promptly review the application to determine whether it is complete or incomplete.  If the application is received 45 days or more before a scheduled foreclosure sale, the servicer must also notify the borrower within 5 days after the servicer acknowledges receipt of the loss mitigation application and that the servicer has determined that the application is either complete or incomplete.  The servicer must complete its review of the loss mitigation application within 30 days.

18. Although Borrowers' loss mitigation application was submitted more than 45

days before a scheduled sale, Servicer failed to comply with any of these obligations.

19. Because Servicer did not designate Borrower's loss mitigation application as either "complete" or "incomplete", then pursuant to 12 C.F.R. § 1024.41(c)(iv), the application automatically is considered to be "facially complete." Thus, the protections against sale established by 12 C.F.R. § 1024.41(g) applied, and Servicer was prohibited from pursuing a foreclosure sale. Servicer violated its obligations under this provision by failing to take any action to cancel the foreclosure. Indeed, Servicer identified the imminent foreclosure sale as the sole basis to deny Borrowers' loss mitigation application. However, that was not a valid basis because Servicer had an affirmative obligation under Regulation X to both complete its substantive review of Borrowers' loss mitigation before the sale was scheduled, and to refrain from proceeding with a foreclosure sale when there was a complete or facially complete loss mitigation application pending.

20. Regulation X (12 C.F.R § 1024.35 (e)) requires that upon receipt of a Notice of Error, the servicer must respond to the notice by either:

> (A) Correcting the error or errors identified by the borrower and providing the borrower with a written notification of the correction, the effective date of the correction, and contact information, including a telephone number, for further assistance;
>
> or
>
> (B) Conducting a reasonable investigation and providing the borrower with a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the Borrowers right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

21. Servicer completely ignored its obligations under 12 C.F.R. 1024.35, and completely failed to substantively respond to Borrowers' Qualified Written Request/Notice of Error.

22. The loss mitigation provisions of Regulation X (12 C.F.R. 1024.41), were implemented by the Consumer Financial Protection Bureau pursuant to a grant of congressional authority arising from the 2010 Dodd/Frank Wall Street Reform and Consumer Protection Act.

23. In passing the Dodd/Frank Wall Street Reform and Consumer Protection Act, Congress recognized an important policy objective in avoiding preventable foreclosures on federally related mortgage loans.

24. As a servicer of a federally related mortgage loan, Servicer was obligated to comply with Regulation X, however it repeatedly failed to do so in connection with both Borrowers' loss mitigation application, as well as Borrowers' efforts to invoke the RESPA/Regulation X error resolution procedures.

25. Pursuant to 12 C.F.R. §1024.41(a) and 12 U.S.C.§ 2605(f), borrowers are expressly authorized to bring a civil action for violations of the Regulation X loss mitigation procedures. Similarly, 12 U.S.C.§ 2605(f), also provides a private right of action for a borrower when a servicer fails to comply with the error resolution procedures.

26. As a result of Servicer's repeated violations of Regulation X's express requirement, Borrowers have been damaged. These damages include, but are not limited to, attorney's fees and litigation costs expended in the state court foreclosure litigation, costs associated with their fruitless efforts to invoke the RESPA/Regulation X error resolution procedures and emotional distress. Borrowers are entitled to recover for these damages, and also to recover reasonable attorneys' fees and costs for the prosecution of this action,

27. Servicer's failure to comply with any of its obligations under RESPA and Regulation X are not isolated incidents but rather represent a pattern or practice of non-compliance with RESPA. Servicer's pattern and practice of non-compliance has recently resulted in action by the New York Department of Financial Services and the Consumer Financial Protection Bureau. Servicer's pattern or practice of non-compliance with RESPA is due to systemic deficiencies which arise from Servicer's failure to develop policies and procedures to comply with RESPA/Regulation X, to employ qualified personnel, to appropriately train, manage, and supervising its servicing employees, and a general failure to adequately invest in servicing infrastructure. Servicer's omissions are the consequence of decisions that Servicer has made in order to enhance Servicer's own profits at the expense of the borrowers whose loans Servicer services. Accordingly, Borrowers are entitled to an award of statutory damages, as well as actual damages.

WHEREFORE, Borrowers demand trial by jury and the entry of judgment in the entire amount of their damages as determined at trial, as well as statutory damages, together with an award of attorney's fees and litigation costs.

## COUNT II   NEGLIGENCE

28. Borrowers re-allege and incorporate by reference the allegations in Paragraphs 1 thorough 27.

29. This is an action for damages in excess of $75,000, including punitive damages, exclusive of interest, attorney's fees and costs.

30. Under RESPA and Regulation X, Servicer had a duty to properly and timely handle Borrowers' loss mitigation in the manner required by 12 C.F.R. 1024.41.

31. Under RESPA and Regulation X, Servicer had a duty to investigate the matters raised in Borrowers' Qualified Written Request/Notice of Error, correct those errors, and respond to Borrowers within the applicable deadlines.

32. Servicer negligently and repeatedly breached all of its duties under RESPA and Regulation X.

33. Servicers' systemic failures to comply with the obligations imposed by RESPA and Regulation X are motivated by an effort to obtain unreasonable financial gain by avoiding the cost of implementing adequate policies and procedures, and employing and training qualified personnel. Furthermore, Servicers actions and omissions described above reflect a willful disregard of Borrowers' known rights established by RESPA and Regulation X. Accordingly, an award of punitive damages is necessary to vindicate deterrent functions of tort law and induce Servicer to correct the systemic deficiencies giving rise to its repeated failures to comply with its obligations under RESPA and Regulation X.

34. As a result of Sevicer's negligence, Borrowers have been damaged. Those damages are continuing and on-going, and are likely to occur again in the future.

WHEREFORE, Borrowers demand trial by jury and the entry of judgment in the entire amount of their damages, including punitive damages, as determined at trial together with an award of the costs of this action.

*(Continued on next page)*

## **DEMAND FOR TRIAL BY JURY**

Borrower demands trial by jury on all claims so triable.

Respectfully Submitted,

THE LAW OFFICES OF JEFFREY N. GOLANT, P.A.

1000 W. McNAB RD. STE. 150
POMPANO BEACH, FL 33069
Phone:  (954) 942-5270
Fax:     (954) 942-5272
Email:   jgolant@jeffreygolantlaw.com
By: **/S/ JEFFREY N. GOLANT ESQ.**
Fla. Bar. No. 0707732
Co-counsel for Plaintiffs Maria Mantilla and John Lage

Jessica L. Kerr, Esq.
Jessica L. Kerr, P.A. 401 E Las Olas Blvd Ste 130 Fort Lauderdale, FL 33301-2477
Fla Bar. No.  92810
Email: jessicakerresquire@gmail.com
Co-counsel for Plaintiffs Maria Mantilla and John Lage