COPY

```
1         IN THE CIRCUIT COURT OF THE 15th JUDICIAL CIRCUIT,
               IN AND FOR PALM BEACH COUNTY, FLORIDA
2
                  CASE NO:  14-CV-81522-BB
3

4

5   JOHN LAGE and MARIA MANTILLA,

6          Plaintiffs.

7   -vs-

8   OCWEN LOAN SERVICES,

9          Defendant.

10  _____/.

11

12

13

14      The Law Offices of Jeffrey N. Golant, P.A.
                1000 W McNab Road, Suite 150
15              Pompano Beach, Florida 33069

16            Thursday, April 16, 2015
                11:01a.m. - 1:08p.m.
17

18          DEPOSITION OF HOWARD HANDVILLE

19

20

21          Taken before Tyesha Scott, Reporter, a Notary

22  Public for the State of Florida at Large, pursuant

23  to Notice of Taking Deposition filed in the

24  above-styled cause.

25
```

**EXHIBIT N**

```
 1          APPEARANCES:

 2          On Behalf of the Plaintiff:

 3          BAKER DONELSON
            100 Southeast 3rd Avenue, Suite 1620
 4          Fort Lauderdale, FL 33394
            954-768-1600
 5          BY:  EVE A. CANN, ESQUIRE
            BY:  SPENCER D. LEACH, ESQUIRE
 6
            On Behalf of the Defendant:
 7
            LAW OFFICES OF JEFFREY N. GOLANT, P.A.
 8          1000 West McNab Road, Suite 150
            Pompano Beach, Florida 33069
 9          954-942-5270
            BY:  JEFFREY GOLANT, ESQUIRE
10          BY:  ASHLEY EAGLE, ESQUIRE
            BY:  JESSICA KERR, ESQUIRE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
1                    INDEX OF PROCEEDINGS

2         Deposition of HOWARD HANDVILLE          Page

3         Direct Examination by Mr. Golant           4
          Cross-Examination by Ms. Cann             41
4         Redirect Examination by Mr. Golant        49

5         Certificate of Oath                       54
          Certificate of Reporter                   55
6
                    DEFENDANT'S EXHIBITS
7         Number         Description                Page

8         Exhibit 1      Deposition Notice           5

9         Exhibit 2      1/31/14 Letter             14

10        Exhibit 3      1/9/14 Ocwen Letter        15

11        Exhibit 4    ` 3/7/14 Ocwen Letter `      18

12        Exhibit 5      3/9/14 Denial Letter       20

13        Exhibit 6      Ocwen Denial Letter        21

14        Exhibit 7      9/12/11 GMAC Denial Letter 22

15        Exhibit 8      Ocwen's Affirmative Defense 28

16        Exhibit 9      Notice of Error            31

17        Exhibit 10     Ocwen Letter               36

18        Exhibit 11     Ocwen Letter               36

19        Exhibit 12     Ocwen Letter               36

20        Exhibit 13     5/10/12 Ocwen Denial Letter 47

21        Exhibit 14     8/5/13 Ocwen Denial Letter  47

22        Exhibit 15     12/24/13 GMAC Denial Letter 47

23        Exhibit 16     8/8/13 Denial Letter       52

24        Exhibit 17     12/30/13 Denial Letter     52

25        Exhibit 18     12/13/12 GMAC Letter       52
```

4

```
1    THEREUPON,

2                        HOWARD HANDVILLE

3          Having been first duly sworn and responding,

4       "I do," was examined and testified as follows:

5                      DIRECT EXAMINATION

6    BY MR. GOLANT:

7       Q.   Good morning.  My name is Jeff Golant and

8    with me is Jessica Kerr and Ashley Eagle.  We represent

9    the Plaintiffs in this action.

10          As I mentioned earlier, I have been a little

11   under the weather and it's a little bit of struggle for

12   me to speak.  If you have any difficulty hearing me,

13   please let me know and I will do my best to be heard.

14          Would you please state your name for the

15   record?

16      A.   My name is Howard Russell Handville.

17      Q.   Okay.  And what do you do for a living?

18      A.   I am a Senior Loan Analyst for Ocwen

19   Financial Corporation.

20      Q.   Have you ever given a deposition before?

21      A.   I have.

22      Q.   Approximately how many times?

23      A.   I'm going to guess north of 50.

24      Q.   Okay.  So you are very well familiar with

25   depositions and I don't need to go into the basics of
```

5

1    how they work, I take it?

2         A.   I'm good with it.

3         Q.   Okay.  Tell you what, we will mark as Exhibit

4    One -- here you go, sir.

5              MS. CANN:  Do you have a copy for us?

6              MR. GOLANT:  Yes.  Right here.

7              MR. LEACH:  Thank you.

8              MR. GOLANT:  You're Welcome.

9              (Thereupon, Defendant's Exhibit One was

10        marked for identification.)

11   BY MR. GOLANT:

12        Q.   Do you recognize that document?

13        A.   Yes.

14        Q.   What do you recognize it to be?

15        A.   The Deposition Notice.

16        Q.   Do you understand this is a corporate

17   representative deposition?

18        A.   I do.

19        Q.   Are you familiar with corporate

20   representative depositions?

21        A.   Why don't you go ahead and explain it to me

22   so we are both on the same page.

23        Q.   Well, you are here testifying today as a

24   representative of Ocwen Loan Servicing, LLC and in

25   order to do that, we have specific subject matter

6

1    designations that you were to be prepared to testify

2    about; do you understand that?

3         A.   Understood.

4         Q.   And are you prepared to testify about the

5    designations in Exhibit Number One?

6         A.   I am.

7         Q.   Okay.  The first designation is Ocwen's

8    handling and underwriting of Plaintiff's loss

9    mitigation application; I guess you are aware that John

10   Lage and Maria Mantilla applied for a loan

11   modification?

12        A.   Right.

13        Q.   There was more than one application, wasn't

14   there?

15        A.   Yes.

16        Q.   How many were there?

17        A.   I don't know.

18        Q.   According to Ocwen, when was their last

19   application, the most recent in time; when was that

20   received?

21        A.   I'm not sure.  I believe we received an

22   application in February and I think also in the

23   beginning of January.  January 8th was the one that

24   came over to us on the loan.

25        Q.   Of what year?

1      A.    2014.

2      Q.    Okay.  What was the decision on that

3  application?

4      A.    There was a decision rendered initially that

5  it was incomplete and there were follow-up

6  communications with the borrower regarding the items

7  they were looking for clarification on, I believe, her

8  employment.

9          And at that time in January, a foreclosure

10  sale was scheduled; I believe it was the 29th of

11  January.

12          They also went over the outstanding documents

13  in a mediation that was held, I believe, in February --

14  getting ahead of myself.

15          The package was considered incomplete.  The

16  letters were sent regarding the incomplete item and

17  then the loan transferred to Ocwen in our Palm Beach

18  office.

19          It got transferred from their servicing

20  platform in Waterloo, Iowa to the servicing platform

21  that we have in West Palm Beach for servicing.  It came

22  over with a designation of an in-flight modification

23  underway.

24          Shortly after, the loan and records were

25  boarded into our system, I believe, within

1    approximately a week.

2            The documents that had been provided to the

3    other divisions had been imaged and they were evaluated

4    and determined to still be incomplete; a follow-up

5    letter was sent out regarding the missing item.

6            We became aware that the foreclosure sale

7    that was scheduled for the 29th was reset.  We became

8    aware of it, I believe, in March, what the new sale

9    date was.

10           We went to mediation and further discussions

11   were had about the documentation.  I think the

12   mediation was held February 24th of 2014; it was

13   telephonic, I believe.

14           The documents that were being requested, I

15   believe were faxed over by an authorized representative

16   of the borrower, Mr. Monzillo; a mediation firm that

17   they were using.

18           I don't know the exact date, I believe it was

19   March 4th.  When the document came in to us it was cued

20   over to the underwriting group to evaluate the

21   completeness of the documentation submitted.

22           The underwriters evaluated it and determined

23   that -- I think it was the 7th of March, that the

24   package was considered complete.

25           The HAMP portion was denied because the loan

9

1     wasn't eligible, because the loan amount exceeded the

2     guidelines.

3            Also at that time, because the sale date was

4     considered to be within seven business days, the HAMP

5     mod was denied for that reason as well.

6            It was also denied for proprietary in-house

7     modification, because the package was considered

8     incomplete and the underwriting took place and it was

9     determined that it was within seven business days from

10    the foreclosure sale date.

11      Q.   When was it determined that the 2014

12    application was incomplete?

13      A.   The determination was made, I believe, around

14    -- I'm sorry, could you repeat the question?

15      Q.   Okay.  I'm referring to the application in

16    2014.  My question is, when did Ocwen determine that

17    that application as initially submitted was incomplete?

18      A.   The application was considered incomplete by

19    the end of January.

20      Q.   Can you say the date?

21      A.   I don't recall off the top of my head.

22      Q.   Do you have any records today that would

23    refresh your recollection?

24      A.   I didn't bring any records with me, but I

25    believe an incomplete or missing document letter was

1    sent, I am going to estimate somewhere on the 23rd or

2    25th of January 2014.

3         Q.   Is that your testimony, that it was sent at

4    that time or you don't know?

5         A.   I am working off of memory; I believe it was

6    generated around the 23rd or 25th of January 2014.

7         Q.   No earlier than the 23rd?

8         A.   I'm not sure.

9         Q.   As a corporate representative for Ocwen,

10   Ocwen is going to be bound by your testimony in this

11   litigation.

12        We've designated your handling and

13   underwriting -- Ocwen's handling and underwriting of

14   the Plaintiff's loss mitigation application and some of

15   the primary issues in this case, defenses that Ocwen

16   has raised relate directly to when the application was

17   received, when it was determined it was incomplete, and

18   what happened after that.

19        So it is very important that we know that

20   information.  What would you need to review to be able

21   to answer that question?

22        A.   The comments, comment log and the

23   correspondence.

24        MR. GOLANT:  Counsel, I think we really need

25        that information to be established before we can

1     pursue much of what I had hoped to accomplish in

2     this deposition.

3         MS. CANN:  Okay.

4         MR. GOLANT:  Would you -- I mean, I don't

5     know if you are able to obtain that now or if you

6     would prefer to resume another day; we can do

7     that.

8         MS. CANN:  It's really whatever you all would

9     like.  I mean, Howard can review off of records --

10    I mean, we as counsel brought some records with

11    us, but, you know, these ended up being not

12    produced in discovery; they weren't responsive to

13    any request for production that you served on us

14    so we haven't--

15        MR. GOLANT:  No, I'm not looking for

16    documents, I'm looking for testimony under the

17    Rule 30(b)(6) designation.

18        MS. CANN:  Okay.

19        MR. GOLANT:  I really think this is well

20    within the designations and it's, you know,

21    important factual details that we need to nail now

22    so if you have documents that will enable him to

23    testify, I have no objection to that.

24        If not, if you can get them, you know, by

25    fax, email or anything like that, I have no

12

```
1    objection to that.
2         If not, I think we need to -- I mean, I'll
3    need to resume this deposition at another day;
4    there's another section I can cover.
5         MS. CANN:  Right.
6         MR. GOLANT:  But anything related to the loss
7    mitigation, I think we need to establish this
8    first.
9         MS. CANN:  Okay.  So why don't we take a five
10   minute recess.  We will talk to Howard and see
11   what he feels most comfortable with, if that
12   works.
13        MR. GOLANT:  That's fine.
14              (Off the record.)
15        MS. CANN:  All right, so, you know, we
16   discussed, Howard, you know, is going to testify
17   as much as he can from recollection, but he can't
18   remember specific dates.
19        I think he is comfortable relying on, you
20   know, the notebooks that we have here.
21        MR. GOLANT:  So you have some documents.
22        MS. CANN:  We have some documents, we have a
23   table of contents that kind of outlines it.  It's
24   all -- it's our work product, but you know.
25        MR. GOLANT:  I believe that's allowed in a
```

1    Rule 30(b)(6) depo.

2         MS. CANN:  Yeah.

3         MR. GOLANT:  So can you read back the last

4    question?

5         COURT REPORTER:  You asked, when did Ocwen

6    determine that the application was incomplete?

7         THE WITNESS:  The determination is documented

8    by a January 31st 2014 missing document letter,

9    where they were requesting pay stub information.

10   BY MR. GOLANT:

11   Q.   That letter was addressed to whom?

12        MR. GOLANT:  If you'd like--

13        MS. CANN:  Yeah.

14        MR. GOLANT:  We can take a copy of that

15   letter if--

16        MS. CANN:  If you want to, yeah, I mean we

17   can introduce that.

18        MR. GOLANT:  It's probably easier than having

19   him describe it.

20        MS. CANN:  Yes.  It's up to you, I mean--

21        MR. GOLANT:  Yeah.

22        MS. CANN:  You can. Well, this is a much

23   easier binder to work with than that.  The one I

24   have is -- just take it out and--

25        MR. GOLANT:  Okay.

14

```
 1          THE WITNESS:  That didn't answer your
 2     question.  We still have an open question on the
 3     table, I believe.
 4          MR. GOLANT:  Okay.  I'm returning your
 5     original.
 6          MS. CANN:  Thank you.  I'll put it back in a
 7     safe location.
 8          MS. CANN:  I'll mark this as Exhibit Two.
 9          (Thereupon, Defendant's Exhibit Two was
10     marked for identification.
11  BY MR. GOLANT:
12     Q.  So this letter is dated January 31st 2014;
13  correct?
14     A.  Correct.
15     Q.  Was it placed in the mail that day?
16     A.  I believe it was.
17     Q.  It wasn't placed in the mail any earlier than
18  that day, was it?
19     A.  I don't think so, no.
20     Q.  Are you aware that on January 20th of 2014,
21  amendments to regulations as concerning loss mitigation
22  took effect?
23     A.  I wasn't aware of the specific date it went
24  into effect.
25     Q.  Are you aware that under these amendments a
```

1   servicer must acknowledge an application and specify

2   whether it is complete or incomplete and any items that

3   are missing, within five days of receipt of the

4   application?

5        A.   I wasn't aware that that specified that.

6        Q.   Is it true then that Ocwen did not

7   acknowledge receipt of Mr. Lage's and Ms. Mantilla's

8   application within five days of receipt or request

9   additional documents within five days of receipt?

10       A.   I'm looking at a letter dated January 9th

11  addressed to the borrowers by Ocwen, confirming that

12  they had received their request for a loan

13  modification.

14            MR. GOLANT:  Let's go ahead, if we can, and

15       make a copy of that one too.

16            MS. CANN:  Yeah.

17            MR. GOLANT:  Okay.  We will make a copy of

18       that and that will be Exhibit Three when it comes

19       back.

20            (Thereupon, Defendant's Exhibit Three was

21       marked for identification.)

22  BY MR. GOLANT:

23       Q.   While she is copying, I will try and move

24  forward.

25            Does that letter request any documents?

16

1   Exhibit Three, the January 9th letter?

2      A.   I don't believe it does.  I believe it

3 confirms receipt and lets them know that they will be

4 evaluating it and get back to them.

5      Q.   Does it indicate whether the application is

6 complete or incomplete?

7      A.   I don't believe it states either way.

8      Q.   Now, the letter that's been marked as Exhibit

9 Two--

10        MR. GOLANT:  This is Three.

11        MS. CANN:  Okay.

12        MR. GOLANT:  I think two--

13        MS. CANN:  That's our original.

14        MR. GOLANT:  Oh, that's the original.

15        MS. CANN:  Two was over there somewhere.

16        MR. GOLANT:  Where's Number Two?  Exhibit Two

17    where did it--

18        MS. CANN:  I saw it earlier.  It was sitting

19    right there.

20        MR. GOLANT:  Okay.  Okay.  What happened

21    here?

22        MS. CANN:  That's just popped into--

23 BY MR. GOLANT:

24      Q.   So the letter dated January 31st 2013 that

25 was marked as Exhibit Two, indicates a request for

17

1    copies of the two most recent pay statements for

2    borrower number one; is that correct?  That's what's

3    requested in that letter?

4        A.    Yes.

5        Q.    Who is borrower number one?

6        A.    Maria Mantilla.

7        Q.    How do you know that?

8        A.    Her name is listed number one on the address

9    line.  She's the first person that the letter is

10   addressed to and that means she is borrower number one.

11       Q.    Did Ocwen receive that requested information?

12       A.    Yes.

13       Q.    When did it receive it?

14       A.    We received a legible copy of it, I believe,

15   March 4th or 5th of 2014.

16       Q.    Did you receive any copies that you would

17   describe as illegible before that?

18       A.    Yes.

19       Q.    Does your system retain images of what was

20   sent?

21       A.    Yes.

22       Q.    So would there be an image of the illegible

23   copy as well as the legible copy?

24       A.    I would think there would be.

25       Q.    When was the next correspondence from Ocwen

1  after it received what you described as a legible copy?

2      A.   On 3/7/14, a document was addressed to the

3  borrowers indicating, we acknowledge receipt of your

4  request for assistance, at this time your application

5  is complete.

6          MR. GOLANT:  Maybe we can go ahead and make a

7      copy of that.

8          MS. CANN:  Okay, Exhibit Four.

9          (Thereupon, Defendant's Exhibit Four was

10     marked for identification.)

11 BY MR. GOLANT:

12     Q.   So once the application was complete, what

13 did Ocwen do at that point?

14     A.   The underwriting department determined that

15 it was complete.  It evaluated it and it was determined

16 that the loan was not eligible for HAMP modification,

17 which had been previously disclosed, because of the

18 loan amount balance -- principle balance exceeding the

19 guideline limits, which I believe were $729,000.00 or

20 thereabout.

21         And another determination was made that the

22 completed application had been received within seven

23 days of the foreclosure sale which was in seven

24 business days.

25     Q.   When was it determined that the loan wasn't

19

1   eligible for HAMP?

2        A.   I believe it was March 6th or 7th.

3        Q.   Before it was complete?

4        A.   No.  When we received the completed

5   documentation regarding the pay stub.

6        Q.   So upon receipt it was immediately determined

7   that the loan wasn't eligible for HAMP?

8        A.   We received the fax, I believe, from Mr.

9   Monzillo on the 3rd or 4th of February -- of March, and

10  it was documented and it was submitted to underwriting

11  on the 6th.

12           The underwriters evaluated it and determined

13  the package was then complete and determined that for

14  the HAMP portion, the balance on the loan exceeded the

15  guideline limits and would not be eligible for that.

16           And it was also determined that the sale date

17  was within seven business days.

18       Q.   When was the borrower notified that their

19  application for HAMP modification would not be

20  approved?

21       A.   I believe the first notification they

22  probably would have received was via a phone call on

23  the 10th of March, where they were verbally advised of

24  their decision then.

25           And the letter, I believe is dated -- the

20

1   denial letter is dated the 9th of March.

2        MR. GOLANT:  Let's go ahead and mark this as

3        Exhibit Five.  You must have some extra copies in

4        there.

5        (Thereupon, Defendant's Exhibit Five was

6        marked for identification.)

7   BY MR. GOLANT:

8        Q.   Is this the denial letter you are referring

9   to?

10       A.   This is the denial letter for the non-HAMP

11  modification.

12       Q.   Is there another denial letter, a separate

13  one for the HAMP modification?

14       A.   Yes.

15       Q.   Do you have a copy of that?

16       MR. GOLANT:  Let's go ahead and make a copy

17       of that.  You still have Four, right?

18       MS. CANN:  Number Five?

19       MR. GOLANT:  Three and Five, so Four is not

20       here.

21       MS. CANN:  You missed one.

22       MR. GOLANT:  Okay.  I just want to make sure

23       -- we are shuffling a lot of papers and I just

24       want to make sure we don't get them mixed up with

25       mine.

1          So the document we just copied, let's mark

2     this as Exhibit number Six.

3          (Thereupon, Defendant's Exhibit Six was

4     marked for identification.)

5  BY MR. GOLANT:

6     Q.   So is Exhibit Five and Exhibit Six different?

7  Strike that.

8          I see the difference.  It's not the same

9  document; I believe it's not.  No, they are different

10 and would you agree with me that the primary difference

11 in these two letters is that one refers to a HAMP

12 modification and the other refers to a proprietary

13 modification?

14    A.   That is correct, they are different.

15    Q.   But the HAMP letter that's H-A-M-P, some

16 people want to call it HEMP, but no.

17    A.   We could take a lot of that when we read.

18    Q.   The HAMP letter doesn't say that the loan

19 principle balance is too high, does it?

20    A.   It does not.

21    Q.   So if the borrower wanted to appeal that, if

22 they thought that you were wrong about that, how would

23 they even know that was an issue to appeal?

24    A.   The borrowers would have been aware of it,

25 because prior denial letters that specify the reason --

1   the specific reason at that time that it was within a

2   sale date range, they were aware that the HAMP

3   application would not be approved based on the

4   guidelines from prior communications.

5        Q.   Can you show me what communications you are

6   referring to?

7        A.   There is a -- we have with us a letter dated

8   September 12, 2011, that is in response to the request

9   for loan modification indicating they are not able to

10  fulfill the request for the following reasons and the

11  reason is the principle balance of the loan exceeds the

12  maximum limit available for HAMP modifications.

13          In a one unit property, the limit is $729-

14  750,000.00 and it goes on to describe the limits for

15  two units, three units, four units, et cetera.

16       Q.   Okay.

17          MR. GOLANT:  Let's make a copy of that one

18       too.

19          (Thereupon, Defendant's Exhibit Seven was

20       marked for identification.)

21  BY MR. GOLANT:

22       Q.   Now, that letter was sent by GMAC Mortgage;

23  correct; GMAC mortgage and not by Ocwen?

24       A.   Correct.

25       Q.   And it was sent in 2011?

23

1       A.   Correct.

2       Q.   Have there been any changes in the HAMP

3  guidelines in the last three years?

4            MS. CANN:  Object to the form; you can

5       answer.

6            THE WITNESS:  Any changes to the guidelines

7       over the past three years?

8  BY MR. GOLANT:

9       Q.   Yes. Any changes at all?

10      A.   There is a change getting ready to take place

11 on April 1st of this year regarding a HAMP modification

12 incentive directive.

13           If the loan has remained under HAMP

14 modification in good standing at the end of six years,

15 the new HAMP guidelines that go in effect in April

16 require an additional $5,000.00 pay down of the

17 principle balance as an incentive to help borrowers,

18 you know, retain and keep their loans.

19      Q.   Other than that change, has there been any

20 changes at all?

21      A.   I don't know.

22           MS. CANN:  Same objection.

23 BY MR. GOLANT:

24      Q.   You don't know?

25      A.   No.

1      Q.   But you would expect that Mr. Lage and Ms.

2   Mantilla would know?

3           MS. CANN:  Again, object to the form.

4   BY MR. GOLANT:

5      Q.   I believe that's what you said, I just want

6   to make sure I understood you correctly.

7      A.   I don't believe the loan limit has changed,

8   but I don't know; other than this documentation that

9   was provided to them indicating anything different.

10     Q.   Right, but I just want to be sure I

11  understand your testimony, sir.

12          You had said that based on this 2011 letter

13  from GMAC, you would have expected them to know that

14  they were not eligible for HAMP even though it wasn't

15  mentioned when OCWEN denied their HAMP application in

16  2014; did I understand that correctly?

17     A.   The letter basically states the reason for

18  denial was because it was considered within seven

19  business days.

20     Q.   Right.  It does not advise them of any

21  ineligibility for the HAMP program; correct?

22     A.   Not based on the loan amount.

23     Q.   And that's my question, how are they expected

24  to know that if they disagreed with that interpretation

25  and wanted to appeal?

1      A.   Well, they were being represented by a person

2   in a mediation capacity.  I would presume they would

3   have to rely on him and his expertise to advise them

4   and provide them the guidance he was representing them

5   for.

6      Q.   But how would he know that?  How would he

7   know that the application was denied for reasons other

8   than was stated in the letter?

9        MS. CANN:  Object to the form.

10   BY MR. GOLANT:

11      Q.   What's the current status of the property?

12      A.   Regarding?

13      Q.   Foreclosure, eviction, all those things.

14      A.   As far as I know, eviction has been stayed

15   pending litigation.

16      Q.   Has there been a sale?

17      A.   Foreclosure sale or REO sale?

18      Q.   Foreclosure sale.

19      A.   Foreclosure sale occurred.

20      Q.   And who bought at the sale?

21      A.   It reverted back to the Plaintiff as an REO

22   property.

23      Q.   Is Ocwen a Plaintiff in the foreclosure

24   matter?

25      A.   I don't recall.

26

1      Q.    Is Ocwen administering the property on behalf

2   of the Plaintiff?

3      A.    Administering it?

4      Q.    Handling the REO?

5      A.    Yes.

6      Q.    Why is it that the fact that there was a sale

7   within seven days of the day that OCWEN determined the

8   application was complete, why is it that that was the

9   date of disqualification?

10         MS. CANN:  Object to the form.

11   BY MR. GOLANT:

12      Q.    Do you understand the question?

13      A.    I do.  I believe the guidelines indicate that

14   that is acceptable.

15      Q.    What guidelines are those?

16      A.    I believe the HAMP guidelines and I believe

17   the CFPB guidelines, community -- CFPB--

18      Q.    Consumer Financial Protection Bureau?

19      A.    Thank you.

20      Q.    Which guideline of the Consumer Financial

21   Protection Bureau do you refer to?

22      A.    I'm not able to quote them.

23      Q.    Are you referring to Regulation X or to other

24   CFPB materials?

25         MS. CANN:  Object to the form.

27

```
 1              THE WITNESS:  I couldn't tell you the
 2         difference.
 3    BY MR. GOLANT:
 4         Q.   So why is it that you believe that the CFPB
 5    approves of the policy of denying a loan modification
 6    seven days before the sale?
 7              MS. CANN:  Object to the form.
 8              THE WITNESS:  I've been under the impression
 9         that we were compliant with CFPB requirements of
10         doing that as well as HAMP guidelines.
11    BY MR. GOLANT:
12         Q.   What gives you that impression?
13         A.   The fact that we have auditors in our office
14    monitoring and doing this to make sure that we stay
15    compliant, in addition to our own procedures to try to
16    maintain that compliance.
17         Q.   Does Ocwen routinely deny applications on
18    that basis?
19              MS. CANN:  Objection to form.
20              THE WITNESS:  If that's the status of that
21         particular loan, then it would deal with it the
22         same way.
23    BY MR. GOLANT:
24         Q.   So it's a common decision.
25         A.   It's not an uncommon decision.
```

1    Q.   I'm sorry, could you repeat--

2    A.   It's not an uncommon decision.

3         MR. GOLANT:  Okay.  I need to take a break

4    for just like three minutes.  I need to find a

5    lozenge somewhere.

6         (Off the record.)

7         (Thereupon, Defendant's Exhibit Eight was

8    marked for identification.)

9  BY MR. GOLANT:

10   Q.   I'm showing you a document that has been

11  marked as Exhibit Number Eight, do you recognize that

12  document?

13   A.   I don't recall seeing this document.

14        MR. GOLANT:  We just started.

15        MS. CANN:  Okay.

16        MR. GOLANT:  Exhibit Number Eight,

17   Affirmative Answers.

18        (Thereupon, Defendant's Exhibit Eight was

19   marked for identification.)

20  BY MR. GOLANT:

21   Q.   That document is the Answer to Affirmative

22  Defenses that Ocwen has filed in this case.

23        As you can see, it has at the top of each

24  page the case number and stamps that are assigned by

25  the Federal Court's PACER system; do you see that?

1      A.   Could you repeat that last part, regarding

2   PACER?

3      Q.   Do you see the markings at the top of the

4   page?  Are you familiar with the Federal Court's PACER

5   system?

6      A.   I've heard of it, but I'm not that familiar

7   with it.

8      Q.   Are you satisfied that this is a pleading

9   that has been filed on behalf of Ocwen in this case?

10      A.   That looks like it.  Okay.  That's it, yeah.

11      Q.   Okay.  On page six, Ocwen raises the defense

12   that it submitted to a prior servicer and says, any

13   application submitted in January of 2014 was sent to a

14   prior servicer of the loan and transferred to Ocwen at

15   a later date.

16      A.   Who was that prior servicer?

17      MS. CANN:  I'm going to object to the form of

18      the question.  This is outside the scope of the

19      deposition notice.

20      MR. GOLANT:  Well it's not, because it goes

21      directly to the handling of the loss mitigation

22      application and even if it were, I can still ask

23      the question, but I do think that it is within the

24      designation.

25      MS. CANN:  Well, my objection is on the

```
 1        record, so.

 2              THE WITNESS:  You say it's on page six?

 3    BY MR. GOLANT:

 4        Q.   Page six, its paragraph number two.

 5        A.   I see it.

 6              MS. CANN:  Just to clarify, I think we will

 7        probably either be withdrawing or be seeking to

 8        amend that affirmative defense.

 9              When we filed it we had some -- we were

10        missing a piece of information.  We have since

11        gotten that information and realize that this is

12        not accurate, so.

13              MR. GOLANT:  Okay.  Well, so you--

14              MS. CANN:  You can still ask questions

15        because it is part of the operating pleading, but

16        just so you know.

17              MR. GOLANT:  I mean, I can, but it's not

18        accurate and it's not going to be part of the

19        case.

20              MS. CANN:  Right.

21              MR. GOLANT:  I don't have to.

22              MS. CANN:  Yeah. So I can break it down to

23        you as to what happened.

24              So Ocwen -- the loan service transferred from

25        GMAC to Ocwen in February 2013.  The issue that we
```

1      were confronted with is that while the loan was

2      being serviced by Ocwen staring in February of

3      2013, it was on the old servicer's platform.

4           The transfer to Ocwen's platform, which

5      Howard mentioned earlier, happened in early 2014.

6           So there was some confusion as we were

7      researching the claims to build our defenses and

8      that's been since clarified and that it is

9      incorrect information included in here.

10          MR. GOLANT:  Okay.  Well, since they will

11     withdraw that particular--

12          MS. CANN:  Well, yes, we will withdraw that

13     defense.

14          MR. GOLANT:  That's fine.  All right.  We'll

15     come back to that later. Let's go to number Nine.

16          (Thereupon, Plaintiff's Exhibit Nine was

17     marked for identification.)

18 BY MR. GOLANT:

19     Q.   Do you recognize that document?

20     A.   Yes.

21     Q.   The second designation in the Notice is the

22 investigation,and the response to Plaintiff's Notice of

23 Error and related correspondence.

24          What sort of investigation did Ocwen do upon

25 receiving that document marked as Exhibit Nine?

1     A.   When Ocwen receives this type of

2  correspondence, it is part of the process involving

3  coordination of responses and logging in and confirming

4  the information through the Ocwen's Consumer Ombudsman

5  Office.

6          After everything has been evaluated and it's

7  determined that we can identify the loan, that it's the

8  right servicer, it's the right borrowers and that

9  everything that we need is there to be able to go

10  through that phase, the intake coordinator assigns it

11  to a research person.

12          They go through a rigorous series of steps to

13  do the research.  They provide the response information

14  to their supervisor and their supervisor approves it.

15          Ultimately, it goes to the document letter

16  that is sent out in response to it and a lot of

17  tracking regarding the source of document, whether it's

18  from a borrower, a borrower's attorney, a regulatory

19  agency, Better Business Bureau, et cetera., is part of

20  that process as well.

21     Q.   Who is the research person that handled the

22  Plaintiff's Notice of Error?

23     A.   I'm going to have to spell out his name,

24  because I can't pronounce it.  I'll try and pronounce

25  it, Smruti Prava Upadhyay, S-M-U-R-U-T-I, second name

33

1   P-R-A-V-A and last name U-P-A-D-H-Y-A-Y, in the

2   research department at Ocwen.

3        Q.   Where does -- do you know that individual?

4        A.   No, I don't.

5        Q.   Have you ever spoken to that individual?

6        A.   I have not.

7        Q.   Where is that individual based; what's the

8   physical location of his workplace?

9             MS. CANN:  Objected to the form.  If you

10        know, you can answer it.

11            THE WITNESS:  I don't know.

12   BY MR. GOLANT:

13        Q.   Does Ocwen maintain employees in India?

14        A.   Yes.

15        Q.   And is this individual such an employee?

16        A.   I don't know.

17        Q.   I'm sorry?

18        A.   I don't know.

19        Q.   Who is that individual -- I can't pronounce

20   it either, who is that individual's supervisor?

21        A.   I do not know.

22        Q.   What research did that individual do?

23        A.   I do not know.

24        Q.   Did that individual do any research?

25        A.   I'm not aware of the work that individual did

34

1    or didn't do.

2         Q.   Now the investigation is one of the

3    designated topics for today.  Is there any information

4    that you can consult that would allow you to testify to

5    that?  Whether it be here or somewhere else?

6         A.   I would need to get in touch with the

7    research department and inquire from them.

8              MR. GOLANT:  Well, after that, I would like

9         to allow the witness an opportunity to do that and

10        depending on where that leads, possibly resume.

11             MS. CANN:  Okay.  We would be agreeable to

12        that provided it is coordinated with everyone's

13        schedules.

14   BY MR. GOLANT:

15        Q.   Did Ocwen ever respond in writing to the

16   Notice of Error?

17        A.   Yes.

18        Q.   How many letters did Ocwen send in, in

19   response to the Notice of Error?

20        A.   I see three letters.  There is a letter dated

21   September 12, 2014 acknowledging receipt of the

22   correspondence, requesting research we performed.

23             There is an October 4, 2014, advising they

24   are not going to be able to respond within the 20 day

25   period and further information on there; and then the

1    October 14th response date letter.

2        MR. GOLANT:  Okay.  Can I take a look at

3    those?  I'm probably going to want to make copies

4    as well.

5        MS. CANN:  These are all copies that were

6    sent to your office.

7        MR. GOLANT:  Well, funny, because I didn't

8    get them.  That's--

9        MS. CANN:  Okay.

10       MR. GOLANT:  I got the acknowledgement but

11   apparently there's a purported response I didn't

12   get.

13       Put these in chronological order.

14       MS. KERR:  Is it going to be separate or

15   together?

16       MR. GOLANT:  No, they'll be separate.  One is

17   two pages and the others are one page.

18       MS. KERR:  Okay.  So these are together?

19       MR. GOLANT:  No.  The last one.

20       MS. KERR:  Oh, okay.  So ten, 11 and 12; is

21   that the way it goes?

22       MR. GOLANT:  Yes.

23       MS. KERR:  Okay.

24       MR. GOLANT:  Do you have a copy of these,

25   Jessica?

36

1          MS. KERR:  Yeah, I gave them their originals

2      back.

3          MR. GOLANT:  Oh, okay.  That's fine. Can I

4      borrow your original?

5          MS. CANN:  For which one?

6          MR. GOLANT:  The October 14th one.

7          MS. CANN:  That's the last one.  Should I

8      make another copy or?

9          MR. GOLANT:  Yeah, that would be better.

10         (Thereupon, Plaintiff's Exhibits 10, 11 and

11      12 were marked for identification.)

12  BY MR. GOLANT:

13      Q.   Okay.  This letter has the electronic

14  signature; a printed name as a signatory.  Is that the

15  same individual that you referred to earlier who was

16  involved in handling the Notice of Error; is that the

17  same person?

18      A.   Are you talking about 12?

19      Q.   Yes.

20      A.   That is the name that I was reading, yes.

21      Q.   Okay.  Now, was this letter mailed?

22      A.   I'm not sure, I don't know.

23      Q.   It's addressed to me, but my address isn't

24  here; is it?

25      A.   No.

1      Q.   But there's a fax number and it is a correct

2    fax number; was this sent by fax?

3      A.   I don't know.

4      Q.   Does Ocwen maintain any sort of a log of fax

5    transmissions that would confirm receipt of any fax

6    that may have been sent to me, at this time?

7      A.   I don't know if they keep fax records, but I

8    do believe they usually note it in the system comment

9    log.

10     Q.   You have a comment log with you, don't you?

11   Can you tell me if the comment log reflects any notes

12   about this October 14th letter?

13     A.   I don't think these go to that date.  It

14   indicates that it was faxed on 10/14.

15          MR. GOLANT:  Would you mind letting us have a

16          copy of that page so we can--

17          MS. CANN:  Let me take a look.

18          MR. SPENCER:  We may need to redact it.

19          MS. CANN:  Yeah.  We can produce it to you

20          after the fact.  We just can't give you a copy

21          today.

22          MS. KERR:  Do we need to request that

23          information or are you just going to provide that?

24          MS. CANN:  We'll provide you with both the

25          redacted comments logs for the time period that's

```
1    relevant.

2         MR. GOLANT:  What's being redacted?

3         MS. CANN:  Notes related to attorney/client

4    communications.  And we will produce a privilege

5    log.

6         MR. GOLANT:  In October?

7         MS. CANN:  Yeah, just notes related to the

8    foreclosure action.

9         MR. GOLANT:  Okay but that's just -- for the

10   immediate purposes, I want to know if any of the

11   attorney/client privileged communications relate

12   to any statements or any communications involving

13   the very difficult to pronounce name that appears

14   on this letter.

15        MS. CANN:  It does not appear, from what I

16   can tell in my very short review right now of the

17   notes on 10/14/14; the notes on that date, so.

18        MR. GOLANT:  So anything else that we might

19   need, I want to know what -- because I never got

20   this, so I would like to know why you thought it

21   was sent and I understand your concern.

22        MS. CANN:  Right.

23        MR. GOLANT:  Just, I don't want to

24   inconvenience anybody today; I know the witness

25   lives locally.
```

1           In the unlikely event there are follow-up

2      questions, I just would like, based on what you

3      are going to produce, I just have to be sure--

4           MS. CANN:  Of course.

5           MR. GOLANT:  -- to whatever degree I can.

6           MS. CANN:  Yeah, yeah, I mean, as far as the

7      investigation into this specific research, we can

8      add this if you determine that there are

9      additional questions on this front.

10           MR. GOLANT:  Sure.  Okay.  Okay, to go back,

11      I think its Number Nine, which is the Notice of

12      Error.

13  BY MR. GOLANT:

14      Q.   What do you understand the concern to be

15  raised in this document?

16           MS. CANN:  Objection; form.

17           THE WITNESS:  My take on it is that you are

18      alleging that Ocwen failed to comply with its

19      obligations under Regulation X, to complete its

20      review of Ms. Mantilla's and Mr. Lage's loss

21      mitigation application within the expressed time

22      period.

23  BY MR. GOLANT:

24      Q.   The letter also expresses concern, doesn't

25  it, that Ocwen failed to evaluate Ms. Mantilla and Mr.

1    Lage for a HAMP modification; doesn't it?

2        A.    Yes.

3        Q.    The letter expresses concern that the loan

4    modification was denied because Ocwen failed to

5    evaluate the application promptly and so essentially

6    used its own delay as grounds for the denial; doesn't

7    it?

8        A.    I believe so.

9        Q.    Can you show me where in this October 14th

10   document those concerns are addressed?

11       A.    They're not addressed specifically, it's a

12   reference to a modification determined by many factors

13   and that it can be denied if the loan doesn't qualify

14   for any or all of the above factors.

15       Q.    Is this a form letter?

16           MS. CANN:  Objection to form.

17           THE WITNESS:  I would think that this would

18       be a template type of a document.  I don't know if

19       that means a form letter in your mind, but they

20       have a template.

21   BY MR. GOLANT:

22       Q.    When you say template, what does that mean to

23   you?

24       A.    A pre-prescribed way of providing a written

25   response to a particular request or concern.

1          MR. GOLANT:  I think we're done.  I have

2     nothing further.

3          MS. CANN:  I think we probably have a couple

4     of follow-up questions.  If we take like a five

5     minute break.

6          MR. GOLANT:  Sure.

7          (Off the record.)

8                    CROSS-EXAMINATION

9  BY MS. CANN:

10     Q.   Okay, we just have a couple of follow-up

11  questions.

12          Howard, you previously testified about a HAMP

13  denial letter sent by the prior loan servicer, GMAC, in

14  2011.

15          To the best of your recollection, based on

16  your coverage and coming here for deposition today,

17  were there additional denial letters specifically

18  referencing HAMP and the reason for the denial as being

19  the amount of the debt that was set after that?

20          I can rephrase that if it's a little hazy,

21  I'm sorry.

22          MR. GOLANT:  I mean, if there's other

23     letters, let's go through them.

24          MS. CANN:  There are other letters, yeah, so.

25          THE WITNESS:  Subsequent to the 2011

```
 1          document, the borrowers were offered a repayment
 2          agreement in December of 2011.
 3               Then, in April of 2012, April 5th and May
 4          10th -- I'm sorry, there was one sent on April 5,
 5          2012; then a loan modification package of around
 6          May 7th of 2012; then there was the May 10,2012
 7          response letter -- bear with me, I'm working off
 8          of this -- there is a correspondence dated May 10,
 9          2012, addressed to the borrowers in care of
10          Hoffman Larin and Agnetti -- it looks like it's
11          truncated, in Miami Beach, referencing the
12          ineligibility for HAMP based on the loan limit
13          exceeding the HAMP guidelines.
14     BY MS. CANN:
15          Q.   What was the date of that letter?
16          A.   May 10, 2012.
17          Q.   Okay.
18               THE COURT REPORTER:  The names that you
19          mentioned?
20               MR. GOLANT:  In care of Hoffman--
21               THE COURT REPORTER:  Is that Hauf--
22               MS. CANN:  H-O-F-F-M-A-N; Larin, L-A-R-I- N;
23          and Agnetti, A-G-N-E-T-T-I.
24               THE COURT REPORTER:  Okay.
25               THE WITNESS:  And there is a letter dated
```

43

1          November 6, 2012 that they were denying their

2          request for a traditional modification because the

3          investor or master servicer of the loan did not

4          approve it.

5     BY MS. CANN:

6          Q.   Was there anything following that as well?

7          A.   May 23, 2012, GMAC sent a letter on behalf of

8     the borrower to the previously mentioned Hoffman, Larin

9     and Agnetti, a repayment agreement specifying the

10    amount of the payments, dates, dollar amounts, and

11    instructions.

12         Q.   Was there another HAMP denial letter dated in

13    August 2013?

14         A.   In January -- January 2, 2013, there's a GMAC

15    letter referencing their request for a traditional loan

16    mod, indicating they are not eligible to fulfill that

17    request, because financial information provided showed

18    you have insufficient income to support your request.

19         Q.   And that was for a traditional loan

20    modification?

21         A.   Yes.  A similar letter dated 8/8/13 from

22    Ocwen addressed to the borrowers in care of Hoffman,

23    Larin and Agnetti, stating the same thing; your request

24    for a traditional loan mod we are unable to fulfill

25    because income is insufficient.

44

```
 1           And I don't know if I said this one or not,
 2   12/30/13 letter from Ocwen, same as the prior two I
 3   referenced regarding their request for a traditional
 4   loan modification.  They are not able to fulfill their
 5   request because the income was deemed insufficient.
 6       Q.  So that's for the traditional mod, what about
 7   for the HAMP?
 8       A.  12/13/12 there is a GMAC Mortgage letter
 9   addressed to the borrowers in care of Hoffman, et al.,
10   requesting additional documentation.
11       Q.  So what was the date of that letter?
12       A.  12/13/12.
13       Q.  And that's a--
14       A.  We refer to it as a missing document letter,
15   internally.
16           MS. CANN:  Okay.  We will make copies and you
17       can ask questions after; is that okay?  And you
18       can mark them.
19           MR. GOLANT:  Are you done?
20           MS. CANN:  No, I have a couple more
21       documents, but I just want -- since I just
22       specifically identified them, that we can make
23       copies.
24           MR. GOLANT:  It sounded like -- wait a
25       minute, hold on a second, Jessica.
```

1           MS. KERR:  Okay.

2           MR. GOLANT:  It sounded like he listed quite

3      a few letters--

4           MS. CANN:  He did list quite a few and I

5      mean, we agreed to produce everything that is

6      noted here.

7           These are the two that I was asked

8      specifically about so we can introduce them as

9      exhibits.

10          Do you want to make copies of the rest as

11     well?

12          MR. GOLANT:  Well, you know--

13          MS. CANN:  It might--

14          MR. GOLANT:  Why don't we do this out of

15     sequence, just because it will be smoother?

16          Because it sounded to me like a lot of these

17     letters really were not particularly relevant to

18     everything that we are here about.

19          So I would like to ask the witness which

20     letter specifically referenced HAMP guidelines

21     relating to principle balance, and I would like to

22     get copies of those.

23          MS. CANN:  Okay.  Those two are on point for

24     that.  And there was, I think--

25          MR. GOLANT:  If the witness doesn't tell us

46

1      there are any more.

2          MS. CANN:  Right.

3          MR. GOLANT:  Okay.

4          MS. CANN:  We can identify them.  Let's take

5      care or these and then--

6          MR. GOLANT:  Let's identify the letters that

7      are -- well, I guess we can just copy them and

8      then mark them and then--

9          MS. CANN:  I mean, I--

10         MR. GOLANT:  Is there more than those two?

11     Is there more than those two?

12         MS. CANN:  I think he mentioned at least one

13     more that was not the 2011 letter.

14         MR. GOLANT:  Okay, then let's see if we can

15     get a copy of that one.

16         MS. CANN:  Yeah, let's see if I can find it.

17     Got it.  So here's the 5/10/12 letter.  Is there

18     another one you had a note on?  I think that was

19     it, that's the one I mentioned, the--

20         Do you want to mark any of those as exhibits

21     for ease of me asking questions?

22         MR. GOLANT:  Okay.  We can do that.

23         MS. CANN:  Okay.  You dictate the order, it

24     doesn't make a difference to me.

25         MR. GOLANT:  Chronologically is probably

```
1        better, right?

2             MS. CANN:  Yeah what--

3             MR. GOLANT:  Pick up where we left off?  We

4        left off at 12.

5             MS. CANN:  So 5/10 would be 13; 8/5 would be

6        14 and 12--

7             (Thereupon, Defendant's Exhibits 13, 14 and

8        15 were marked for identification.)

9    BY MS. CANN:

10       Q.   So Howard you already described the 5/10/12

11   letter as a HAMP denial letter.  Can you -- the 8/5/13

12   letter, which will be marked as Exhibit 14, is this

13   another HAMP denial letter sent to the borrowers?

14       A.   It is.

15       Q.   Was this send directly to the borrowers or to

16   opposing counsel at the time?

17       A.   This was sent to Hoffman, Larin and Agnetti.

18       Q.   Okay.  And what was the reason for denial in

19   this letter?

20       A.   The HAMP modification is ineligible because

21   the principle balance of the loan exceeds the maximum

22   limit.

23       Q.   Okay.  And the last letter that we briefly

24   mentioned, what's the date on that one?

25       A.   This one is 12/24/13 and it's addressed to
```

48

1    the borrowers.

2         Q.    Not to in care of that counsel?

3         A.    Correct.

4         Q.    Okay.

5         A.    And like the previous letter, it says that

6    they are not able to fulfill the request for the HAMP

7    loan modification because the principle balance exceeds

8    the maximum limit to be eligible for a HAMP

9    modification.

10        Q.    Okay.  To the best of your recollection and

11   your review of the documents, were there any other HAMP

12   letters or denials letters specifically referencing the

13   amount of the principle balance exceeding the HAMP

14   limits after 12/24/13?

15        A.    I don't believe so.

16        Q.    So aside from all the various correspondence

17   that we discussed here today, based on your review of

18   the records and your preparation for the deposition

19   today, were other communication efforts made between

20   Ocwen and the borrowers?

21        A.    There were a number of phone calls in

22   reference to the HAMP application and the missing

23   documents.

24             There was pre and post-mediation contact as

25   well as the mediation that occurred and they were

1   specific to the documentation that they needed and

2   requesting that it be immediately sent.

3      Q.   And these were calls both from Ocwen to the

4   borrowers and from the borrowers to Ocwen?

5      A.   Either borrowers or their authorized

6   representatives as well as the mediator.

7      Q.   Okay.  Thank you.

8        MS. CANN:  I think that covers the questions

9      I had so back to you.

10             REDIRECT EXAMINATION

11  BY MR. GOLANT:

12      Q.   Just a few moments ago, sir, you testified

13  that some phone calls were made to the Plaintiff's in

14  this case about their loss mitigation application; how

15  do you know that?

16      A.   A review of the call logs, call notes.

17      Q.   What do those call notes reflect?

18      A.   Contact.

19      Q.   Do they reflect the substance of the

20  conversation?

21      A.   In most cases, yes.

22      Q.   Again, counsel's first question asked you

23  about other letters relating to loan modifications and

24  you referenced a few and some of them were even missing

25  document letters.

1          I just want to ask you, other than the

2    documents that I believe we marked as Exhibit 13, 14

3    and 15, are there any other letters that reference the

4    maximum principle amount for a HAMP modification?

5          A.   I don't recall seeing any, other than the

6    ones we highlighted and brought forth.

7          Q.   Some of the letters you spoke with counsel

8    about determined that Ms. Mantilla's and Mr. Lage's

9    income was insufficient for a HAMP modification and

10   that determination was made by GMAC; did Ocwen ever

11   make that determination?

12          MS. CANN:  I object to the form.  I think

13      you've mischaracterized the letters that he was

14      testifying about.

15          MR. GOLANT:  I don't think so, but if I did,

16      he can explain that to me.

17          THE WITNESS:  I believe the letters

18      referencing unable to qualify for income was based

19      on traditional modifications, not the HAMP

20      modification eligibility.

21   BY MR. GOLANT:

22          Q.   Did Ocwen ever determine that Ms.  Mantilla's

23   and Mr. Lage's income was insufficient for any sort of

24   loss mitigation application or program?

25          A.   Can I see the exhibits?  If I think I

51

1    understand your question correctly, you asked me if

2    Ocwen had ever determined if they were unable to

3    afford.

4            The 8/8/2013 letter is from Ocwen referencing

5    their request for a traditional loan modification and

6    the financial information provided shows you have

7    insufficient income to support the request.

8        Q.   Was that the most recent determination by

9    Ocwen on that issue?

10       A.   On 12/30/13 would be the most recent version

11   referencing the financial information that says they

12   have insufficient income to support the request.

13       Q.   That is the most recent one?

14       A.   I believe so.

15       Q.   And what was that date?

16       A.   12/30/13.

17           MR. GOLANT:  Okay.  That document hasn't been

18       marked, has it?

19           MS. CANN:  No.  You want just the December

20       one or the August one as well?

21           MR. GOLANT:  The one he referenced.

22           MS. CANN:  He referenced them both.

23           MR. GOLANT:  Okay, then yes.

24   BY MR. GOLANT:

25       Q.   What the difference between a HAMP

52

1   modification and a traditional modification?

2       A.   Under a HAMP modification, if a borrower

3   qualifies and completes the trial payment plan and

4   executes the required modification agreement, assuming

5   the loan is actually modified, the borrower receives a

6   special annual -- not sure what the term is, they apply

7   funds to pay down the principle balance on the

8   anniversary of each year completed successfully keeping

9   the loan in the mod in good standing.

10          Whereas, you don't receive those types of

11  incentives under a non-HAMP modification.

12          MR. GOLANT:  Nothing further.

13          MS. CANN:  Okay.  Do you want to mark those?

14          MR. GOLANT:  Yeah, we'll mark those.  We left

15      off at 15.

16          (Thereupon, Defendant's Exhibits 16, 17 and

17      18 were marked for identification.)

18          MS. CANN:  16, 17, 18?

19          MR. GOLANT:  And then I guess the question

20      remaining is whether he can obtain more

21      information about--

22          MS. CANN:  The research?

23          MR. GOLANT:  Yeah.

24          MS. CANN:  Okay.  Yeah, we will make every

25      effort and we can, you know, if the answer is yes

1      -- I mean, either way you want to have him on

2      record, yes, I was able to get you more

3      information, here's what I learned or no, I didn't

4      get any more information.

5          MR. GOLANT:  If he is able to get more

6      information then I probably would like to continue

7      the deposition.  If not, we can just stipulate

8      that knowledge.

9          MS. CANN:  Okay.  So give us maybe -- let's

10     see what we can get done in two weeks and we will

11     revisit the issue.  If we need additional time, we

12     will let you know and we will then, you know,

13     depending on what the outcome is, we will

14     stipulate it.

15         (The deposition was concluded at 1:08 p.m.)

16         (Reading and signing of the deposition was

17     waived by the witness and all parties.)

18

19

20

21

22

23

24

25

54

```
 1              C E R T I F I C A T E  OF OATH

 2

 3   STATE OF FLORIDA

 4   COUNTY OF BROWARD

 5

 6

 7         I, Tyesha Scott, Reporter, Notary Public,

 8   State of Florida, certify that HOWARD HANDVILLE

 9   personally appeared before me on the 16th day of

10   April, 2015 and was duly sworn.

11

12         Signed this 12th day of May, 2015.

13

14

15

16         _____

17         Tyesha Scott, Reporter
           Notary Public, State of Florida
           Commission No.: FF 32471
18         Commission Expires:6/30/17

19

20

21

22

23

24

25
```

55

```
1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF BROWARD

5

6          I, Tyesha Scott, Reporter, certify that I was

7    authorized to and did report the deposition of

8    HOWARD HANDVILLE, that a review of the transcript

9    was not requested; and that the transcript is a

10   true and correct record of my notes to the

11   proceedings.

12         I further certify that I am not a relative,

13   employee, attorney, or counsel of any of the

14   parties, nor am I a relative or employee of any of

15   the parties' attorneys or counsel connected with

16   the action, nor am I financially interested in the

17   action.

18         Dated this 12th day of May, 2015.

19

20

21   _____

22   Tyesha Scott,  Reporter

23

24

25
```