**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**Case No. 14-cv-81522-BLOOM/VALLE**

JOHN LAGE and MARIA MANTILLA,

      Plaintiffs,

v.

OCWEN LOAN SERVICING LLC,

      Defendant.

_____/

**OMNIBUS ORDER DENYING PLAINTIFFS' MOTION TO STRIKE AND GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

THIS CAUSE is before the Court upon Defendant Ocwen Loan Servicing, LLC's Motion for Summary Judgment, ECF No. [50] (the "Motion") and Plaintiffs, John Lage and Maria Mantilla's Motion to Strike Defendant's Affidavit, ECF No. [59] (the "Motion to Strike") (collectively, the "Motions"). Having reviewed the Motions, all supporting and opposing filings, the record in this case, and with the benefit of oral argument on November 10, 2015, the Court is now fully advised. For the reasons that follow, Defendant Ocwen Loan Servicing, LLC's Motion is GRANTED.

**I.      BACKGROUND AND RELEVANT FACTS**

This action arises from Defendant Ocwen Loan Servicing, LLC's purported violations of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.* ("RESPA") and its implementing regulations, 12 C.F.R. part 1024 ("Regulation X" or "Regulation"). *See generally* Complaint, ECF No. [1] ("Compl."). In short, Plaintiffs, John Lage ("Lage") and Maria Mantilla ("Mantilla") (collectively, "Plaintiffs"), assert that Defendant Ocwen Loan Servicing, LLC

(hereinafter, "Ocwen") neglected Plaintiffs' loss mitigation application and otherwise failed to abide by the loss mitigation and notice of error procedures established by RESPA and Regulation X.  *See id.* at ¶¶ 16-27.  In addition, Plaintiffs assert a claim for common-law negligence stemming from the aforementioned statutory violations.  *Id.* at ¶¶ 28-34.

Before addressing the facts of this case, the Court is compelled to comment on the manner in which the record has been presented.  A summary judgment movant's initial burden consists of a "responsibility [to] inform [ ] the . . . court of the basis for its motion and [to] identify[ ] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  While the record is voluminous, certain exhibits contain reduced, illegible documents.  *See, e.g.* Exhibit F, ECF No. [49-6], Exhibit G, ECF No. [49-7] at 6-18.  More troubling, however, is the parties' casual citation to sizable exhibits without reference to particular pages or documents contained therein. *See, e.g.,* Motion at 10 (citing to "generally Exhibits G, H, and I," which, collectively, contain over 400 pages); Plaintiffs' Statement of Facts, ECF No. [49] at ¶ 8 (containing general references to various exhibits); Plaintiffs' Response, ECF No [54] at 9-11 (referencing hundreds of pages of deposition testimony without providing a pincite).  "Judges are not like pigs, hunting for truffles buried in briefs."  *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (Posner, J.).  "Likewise, district court judges are not required to ferret out delectable facts buried in a massive record."  *Chavez v. Sec'y Florida Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011).  Nevertheless, after thorough review, the Court has discerned the following facts.

On July 11, 2006, Plaintiffs obtained a loan with a principal balance of $786,700.00 from Greenpoint Mortgage Funding, Inc., secured by a mortgage on their property in Boynton Beach, Florida. *See* Ocwen's Statement of Material Facts, ECF No. [49] (hereinafter, "Ocwen SOF") at ¶ 1; Plaintiffs' Response Statement of Facts, ECF No. [53] (hereinafter, "Pls. SOF") at ¶ 1. Three years later, Plaintiffs fell behind on their loan payments, and on October 23, 2009, a complaint to foreclose the mortgage was filed. Ocwen SOF at ¶ 2; Pls. SOF at ¶ 2. In February 2013, Ocwen became the servicer of the loan. Ocwen SOF at ¶ 4; Pls. SOF at ¶ 4. On October 1, 2013, a final judgment of foreclosure was entered against Plaintiffs and a foreclosure sale was set for January 29, 2014. Ocwen SOF at ¶ 6; Pls. SOF at ¶ 6.

Three weeks before the scheduled foreclosure sale, on January 8, 2014, Plaintiffs faxed a loss mitigation application to Ocwen. *See* Ocwen SOF at ¶ 7; Pls. SOF at ¶ 7; Exhibit "F" to Ocwen SOF, ECF No. [49-6] ("Exhibit F") at 1 (containing facsimile transmittal sheet bearing January 8, 2014 date and stating that "a complete loan modification package" was enclosed). In a letter dated January 9, 2014, Ocwen acknowledged receipt of the application and informed Plaintiffs that they would be notified if additional documents were required. *See* Exhibit "G" to Ocwen SOF, ECF No. [49-7] (hereinafter, "Exhibit G") at 1-2. On January 10, 2014, Plaintiffs were advised that additional paystubs were required. *See* Ocwen SOF at ¶ 8. The same day, Mantilla forwarded Ocwen a copy of various paystubs. Exhibit G at 3-18.[1] Ocwen believed Mantilla's submission to be inadequate as they were missing certain pay periods, a year-to-date gross pay. *See id.* at 19. When Mantilla allegedly failed to provide such information, Plaintiffs' HAMP loan application was denied. *See id.* (stating that the Plaintiffs would not receive a

---

[1] As previously noted, many of these documents are so unintelligible that it remains unclear as to whether these paystubs were for the most recent pay period, as per Ocwen's request. Further, the Court is unable to ascertain whether these paystubs were part of the documents purportedly faxed to Ocwen on January 10th.

HAMP loan modification because Ocwen "previously requested additional information from [Plaintiffs] which has not been received; therefore, [Ocwen]   [was] unable to continue [its] review for workout solutions").   Nevertheless, Ocwen continued to work with Plaintiffs regarding the possibility of a loan modification.   *See generally* Exhibit "H" to Ocwen SOF, ECF No. [49-8] (hereinafter, "Ocwen Activity Logs" or "Activity Logs") at 77-111 (indicating ongoing communications with Plaintiffs).   On January 24, 2014, the parties attended mediation where Plaintiffs agreed to provide the requested paystubs and additional employment information and documentation.   Ocwen SOF at ¶ 9; Pls. SOF at ¶ 9.   On January 28, 2014, the January 29, 2014 foreclosure sale was rescheduled to March 14, 2014, seemingly so Plaintiffs could avail themselves of the loss mitigation procedures available under Regulation X.   *See* State Court Docket, ECF No. [49-2] at 18; Ocwen SOF at ¶ 10; Pls. SOF at ¶ 10; Ocwen Activity Logs at 83.[2]

Ocwen repeatedly informed Plaintiffs that the application was incomplete, sending additional requests for information and documentation on January 31, 2014 and February 13, 2014.   *See* Exhibit G at 23, 26.   The January 31, 2014 letter once again requested that Plaintiffs provide "[c]opies of the 2 most recent pay stubs for [Mantilla]."   *Id.* at 23 (the "January 31st Letter").   Pursuant to 12 C.F.R. § 1024.41(b)(2)(i) and (ii),[3] the January 31st Letter advised Plaintiffs that the required documentation should be submitted on or before March 4, 2014, a mere ten (10) days before the scheduled foreclosure sale.   *Id.*   Then, on February 13, 2014, Ocwen again informed Plaintiffs that the application remained incomplete and requested more

---

[2] The unredacted portion of Ocwen's Activity Logs has been reviewed by the Court *in camera*.

[3] If an incomplete application is received 45 days or more before a foreclosure sale, 12 C.F.R. § 1024.41(b)(2) requires the servicer to advise the borrower of "the additional documents and information the borrower must submit to make the loss mitigation application complete and the applicable due date . . . ."

substantial documentation, namely: (1) a hardship affidavit; (2) a signed 4506-T form for each borrower; (3) the two most recent paystubs with year-to-date income for each borrower; (4) a completed Dodd-Frank Certification; and (5) a signed HAMP Financial form. *Id.* at 26. Yet again, on February 28, 2014, Ocwen informed Plaintiffs that their application was incomplete. *See id.* at 109 (the "February 28th Letter"). However, rather than identify the supplemental information required, the February 28th Letter merely directed Plaintiffs to call Ocwen's Customer Care Center and noted that this unidentified documentation must be submitted by May 12, 2014, nearly a month after the home was scheduled to be sold. *Id.* at 109-10.

Throughout this time, Plaintiffs repeatedly communicated with Ocwen's representative regarding the status of their application. *See* Ocwen's Requests for Admission and Plaintiffs' Response, ECF No. [49-13] at ¶¶ 11, 23. For instance, Ocwen received several communications from Plaintiffs on or about February 25 or 26, 2014, where Plaintiffs provided additional employment and pay records. *See* Exhibit G at 82-108.

On March 3, 4, and 6, 2014, Ocwen received what appears to be the requested documentation. *See id.* at 112-28. Thus, according to Ocwen, Plaintiffs application became complete on or about March 7, 2014. Indeed, on March 7, 2014, Plaintiffs received a letter from Ocwen informing them that their application was deemed complete. *See* Ocwen's Requests for Admission and Plaintiffs' Response, ECF No. [49-13] at ¶ 14; *see also* Exhibit G at 131. Two days later, on March 9, 2015, Ocwen expressly denied Plaintiffs' request for a loan modification because, "[a]s of the date of th[e] letter, [the Plaintiffs'] loan ha[d] a confirmed sale date within 7 days." Exhibit G at 133. Although the Plaintiffs sought to cancel the foreclosure sale on March 13, 2014, the request was denied and the foreclosure sale occurred as planned. *See* Ocwen SOF at ¶ 15; Pls. SOF at ¶ 15.

On September 4, 2014, while Plaintiffs continued to occupy the home, Plaintiffs sent Ocwen a "Qualified Written Request/Notice of Error," asserting that Ocwen failed to comply with Regulation X, 12 C.F.R. § 1024.41, "and specifically invoking the error resolution procedures established by RESPA and Regulation X." Compl. at ¶ 13; *see also* Qualified Written Request/Notice of Error, ECF No. [1-1] (hereinafter, "Plaintiffs' NOE" or "NOE"). Plaintiffs' NOE claimed that Ocwen shirked its obligations under Regulation X by failing to review the application within the express time provided "and then relied on its own failure as the sole basis to deny [the] application." *See* Plaintiffs' NOE at 2. On September 12, 2014, Ocwen acknowledged receipt of Plaintiffs' correspondence requesting research to be performed for the loan. *See* September 12, 2014 Letter, ECF No. [49-10] at 7 ("Ocwen's Sept. 12th Letter"). After extending the responsive period as permitted under 12 C.F.R. § 1024.35, Ocwen answered. *See* October 12, 2014 Letter, ECF No. [49-10] at 8; October 14, 2014 Letter, ECF No. [49-10] at 9 (hereinafter, "Response to Plaintiffs' NOE"). In responding to the NOE, Ocwen simply referred Plaintiffs to the denial letter sent on March 9, 2014 for the denial reason. *See* Response to Plaintiffs' NOE at 9; *see also* Facsimile Confirmation, ECF No. [49-11] (indicating that the Response to NOE was successfully faxed on October 15, 2014); Affidavit of Howard R. Handville dated July 7, 2015, ECF No. [49-12] at ¶¶ 4-5. Because the Response to Plaintiffs' NOE merely referenced the previous denial letter and provided no additional clarification, Plaintiffs state that Ocwen "completely ignored its obligations under 12 C.F.R. § 1024.35, and failed to substantively respond to [Plaintiffs] Qualified Written Request/Notice of Error." *See* Compl. at ¶¶ 14, 21. Ocwen readily admits, through its consumer representative, that Ocwen's Response to Plaintiffs' NOE "didn't specifically address" the concerns raised in Plaintiffs' correspondence, and was a "template" or "pre-prescribed way of providing a written response to

a particular request or concern."  Deposition of Howard Handville, ECF No. [47-1] ("Handville Depo.") at 39:14-40:25.

Based on the foregoing, Plaintiffs commenced this action, claiming they suffered actual damages in the form of "attorney's fees and litigation costs expended in the state court foreclosure action, costs associated with their fruitless efforts to invoke the RESPA/Regulation X error resolution procedures and emotional distress."  *See* Compl. at ¶ 26.  Concerning Plaintiffs' emotional distress, Plaintiffs state they have suffered extreme stress, health issues,[4] and had to seek marital counseling.[5]  *See* Deposition of Maria Mantilla, ECF No. [45-1] ("Mantilla Depo.") at 85:10-22, 110:18-111:2, 120:1-121:12, 137:11-18.  Mantilla also claims that her work and earnings have suffered as a result of this process.  *Id.* at 122:1-22 ("I've had to take time off to meet with attorneys, to go to court . . . .").  Pointing to an alleged "pattern or practice of non-compliance with RESPA," Plaintiffs also seek statutory damages.  *See* Compl. at ¶ 27.  Last, Plaintiffs request punitive damages for Ocwen's "systemic failure[] to comply with the obligations imposed by RESPA and Regulation X," believing that its "acts and omissions represent a willful disregard of Plaintiffs' known rights established by RESPA and Regulation X."  *Id.* at ¶ 33.

## II.    LEGAL STANDARD UNDER FED. R. CIV. P. 56

A party may obtain summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

---

[4] Prior to commencing this action Plaintiff Lage suffered a heart attack.  Lage believes that his heart attack "had something to do with [the loan modification] process," but is unable to articulate how.  *See* Deposition of John Lage Deposition, ECF No. [46-1] ("Lage Deposition") at 40:24-41:3.

[5] To the exclusion of the aforementioned marital counseling, Plaintiff Mantilla never sought medical treatment or counseling for her distress.  *See* Mantilla Depo. at 121:13-15.

R. Civ. P. 56(a).  The parties may support their positions by citation to the record, including inter alia, depositions, documents, affidavits, or declarations.  Fed. R. Civ. P. 56(c).  An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Id.* (quoting *Anderson*, 477 U.S. at 247-48).  The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which a jury could reasonably find for the plaintiff."  *Anderson*, 477 U.S. at 252.  Further, the Court does not weigh conflicting evidence.  *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact.  *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).  Once this burden is satisfied, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'"  *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).  Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'"  *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to

suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. Even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

In resolving issues presented for summary judgment under Fed. R. Civ. P. 56, "the court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Carlin Commc'n, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986); *see also Aurich v. Sanchez*, 2011 WL 5838233, at *1 (S.D. Fla. Nov. 21, 2011) ("If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the court must not grant summary judgment." (citing *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir. 1993))).

In particular, summary judgment is inappropriate where the Court would be required to weigh conflicting renditions of material fact or determine witness credibility. *See Hairston*, 9 F.3d at 919; *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."); *see also Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he [or she] is ruling on a motion for summary judgment or for a directed verdict." (quoting *Anderson*, 477 U.S. at 255)); *Gary v. Modena*, 2006 WL 3741364, at *16 (11th Cir. Dec. 21, 2006) (Fed. R. Civ. P. 56 precludes summary judgment where court would be required to reconcile conflicting testimony or assess witness credibility);

*Ramirez v. Nicholas*, 2013 WL 5596114, at *4 (S.D. Fla. Oct.11, 2013) ("The Court may not make the credibility determinations needed to resolve this conflict; only the jury may do so.").

## III.   DISCUSSION

Ocwen seeks summary judgment on all of Plaintiffs' claims on a plethora of bases.  Most notably, Ocwen contends that the initial submission of an application after the Effective Date of the regulation's implementation is a prerequisite to obtaining any protection under Regulation X. As such, Regulation X's effective date of January 10, 2014 –  two days after the submission of Plaintiffs' application - precludes Plaintiffs' claims as Ocwen had no duty to evaluate Plaintiffs' application.  Additionally, Ocwen asserts that Plaintiffs' claim for actual damages is without merit and unsupported by the record. Plaintiff contends that the loss mitigation obligations under 12 C.F.R. § 1024.41 are only triggered upon the servicer's receipt of a "complete" or "facially complete" application, and because Plaintiffs' application was complete at some yet-to-be-determined point after the Effective Date, Ocwen was not free to avoid its duties under Regulation X.  Prior to addressing the more substantive arguments, the Court first turns to Plaintiffs' Motion to Strike.

### A.    Plaintiffs' Motion to Strike

In response to Ocwen's Motion, Plaintiffs quarrel with various assertions contained in Ocwen's SOF, believing that many of the stated "facts" are replete with hearsay and other inadmissible evidence.  Plaintiffs' Response, ECF No. [54] at 1-2; Plaintiffs' SOF at 1-2. Seeking to address this evidentiary challenge, Ocwen submits the affidavit of their corporate representative, Howard R. Handville.  *See* Affidavit of Howard R. Handville dated October 9, 2015, ECF No. [58-1] (hereinafter, "October Handville Affidavit" or "Affidavit") at ¶¶ 3-11. Plaintiffs request that the Court strike the Affidavit, believing it to be too little, too late.  *See*

*generally* Motion to Strike.  Plaintiffs claim that the Affidavit contains conclusory statements and does not comply with Local Rule 7.1 of the Southern District of Florida, which mandates that reply memorandum be limited to matters of rebuttal.  *See id.*

Rule 7.1(c) of the Local Rules of the Southern District of Florida provides that a reply memorandum "shall be strictly limited to rebuttal of matters raised in the memorandum in opposition without re-argument of matters covered in the movant's initial memorandum of law." S.D. Fla. L.R. 7.1(c).  Thus, "[a] reply memorandum may not raise new arguments or evidence, particularly where the evidence was available when the underlying motion was filed and the movant was aware (or should have been aware) of the necessity of the evidence." *Baltzer v. Midland Credit Mgmt., Inc.*, No. 14-20140-CIV, 2014 WL 3845449, at *1 (S.D. Fla. Aug. 5, 2014) (citing *Foley v. Wells Fargo Bank, N.A.*, 849 F. Supp. 2d 1345 (S.D. Fla. 2012); *TCC Air Servs., Inc. v. Schlesinger*, No. 05–80543–CIV, 2009 WL 565516, at *7 (S.D. Fla. Mar. 5, 2009)).  Local Rule 7.1(c) does not categorically prohibit the addition of affidavits and declarations accompanying a reply memorandum.  *See* S.D. Fla. L.R. 7.1(c) (noting that "[a]ll materials in support of any motion, response, or reply, including affidavits and declarations, shall be served with the filing").  However, there exists a subtle yet noteworthy distinction between "new arguments and evidence, on the one hand, and rebuttal arguments and evidence, on the other." *Giglio Sub s.n.c. v. Carnival Corp.*, No. 12-21680-CIV, 2012 WL 4477504, at *2 (S.D. Fla. Sept. 26, 2012) *aff'd*, 523 F. App'x 651 (11th Cir. 2013).  While raising new arguments on reply is generally inappropriate, reply evidence "may contain facts not previously mentioned in the opening brief, as long as the facts rebut elements of the opposition memorandum and do not raise wholly new factual issues." *Giglio*, 2012 WL 4477504, at *2 (citing *Burger King Corp. v. Ashland Equities, Inc.*, 217 F. Supp. 2d 1266, 1280-81 (S.D. Fla. 2002)); *see also ABCO*

*Premium Fin. LLC v. Am. Int'l Grp., Inc.*, No. 11-23020-CIV, 2012 WL 3278628, at *4 (S.D. Fla. Aug. 9, 2012) *aff'd*, 518 F. App'x 601 (11th Cir. 2013) ("While the raising of new issues and submission of new facts in reply brief is improper, a court has the discretion to consider the additional exhibits despite this procedural shortcoming." (internal quotation and citation omitted)).

The Court finds that the October Handville Affidavit does not run afoul of Local Rule 7.1(c)'s requirement. The Affidavit explicitly rebuts issues raised by Plaintiffs' in response to Ocwen's original Motion, specifically, those disputing the sufficiency of Ocwen's record evidence. There is no requirement that rebuttal matters be exclusively limited to factual, not procedural issues. As noted by the Eleventh Circuit, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *See Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) (internal citation and quotation omitted); *see also Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (11th Cir. 2012) (noting "[t]he general rule [] that inadmissible hearsay cannot be considered on a motion for summary judgment") (internal quotation and citation omitted). The allegedly conclusory aspects of the testimony at issue may be remedied by having Handville attest to such matters at trial, if trial were necessary. *See Jones*, 683 F.3d at 1294 (observing that "[t]he most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial") (citing *Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996)). Plaintiffs' timeliness challenge is also unpersuasive. Accordingly, the Motion to Strike is denied.[6]

---

[6] Ultimately, the sufficiency of the contested evidence has little to bearing on the Court's ultimate decision as to Plaintiffs' RESPA and Regulation X claims. *See supra* Section III.B, D, and E.

**B.** **The Effective Date of Regulation X Precludes Plaintiffs' Claim for Violations of Regulation X's Loss Mitigation Procedures, 12 C.F.R § 1024.41**

  *i.*    *The Servicer's Requirements under RESPA and Regulation X*

  "RESPA is a consumer protection statute that regulates the real estate settlement process." *Hardy v. Regions Mortgage, Inc.*, 449 F.3d 1357, 1359 (11th Cir. 2006) (citing 12 U.S.C. § 2601(a)). Under RESPA, the Consumer Financial Protection Bureau (the "CFPB" or the "Bureau") is tasked with prescribing rules and regulations, as well as interpretations, "as may be necessary to achieve" RESPA's purpose. *See* 12 U.S.C. § 2617(a). One such implementing regulation, Regulation X, places various obligations on mortgage servicers when a borrower submits a loss mitigation application. *See generally* 12 C.F.R. § 1024.41.

  Regulation X's loss mitigation procedures set forth a distinct program by which the borrower's application is assessed for completeness and timeliness, and further dictates the method and timeline that a servicer must abide by in order to attain completeness and evaluate the application. *See generally id.* When a servicer receives an application forty-five (45) days prior to a foreclosure sale, the servicer is required to immediately ascertain whether the application is complete and notify the borrower of this determination, in writing, within five (5) days. *Id.* at § 1024.41(b)(2)(i). Generally, an application shall be considered complete when the servicer "has received all the information that the servicer requires from a borrower in evaluating applications for the loss mitigation options available to the borrower." *Id.* at § 1024.41(b)(1). Should the application be deemed incomplete, the servicer must "exercise reasonable diligence in obtaining documents and information to" complete the application, notifying the borrower, within five days, of "the additional documents and information the borrower must submit to make the loss mitigation application complete" and state "a reasonable date by which the borrower should submit the documents and information." *Id.* at § 1024.41(b)(1), (b)(2)(i) and

(ii).  If the borrower fails to respond within the reasonable time provided and the application remains incomplete, the servicer may, at its discretion, evaluate the incomplete application.  *Id.* at § 1024.41(c)(2)(ii).   On the other hand, if the borrower submits the requested documents or no additional information is requested, the application is considered "facially complete," a term commensurate with general "completeness" for the purposes of triggering the servicer's evaluation obligations.  *See id.* at § 1024.41(c)(2)(iv) ("If a borrower submits all the missing documents and information as stated in the notice required pursuant to § 1026.41(b)(2)(i)(B), or no additional information is requested in such notice, the application shall be considered facially complete. If the borrower completes the application within this period, the application shall be considered complete as of the date it was facially complete, for the purposes of paragraphs (d), (e), (f)(2), (g), and (h) of this section, and as of the date the application was actually complete for the purposes of paragraph (c).").  When the application is rendered complete—either in actuality or facially—more than thirty-seven (37) days before the foreclosure sale, the evaluation procedures under Subsection (c) are triggered.  *See id.* at § 1024.41(c).

Pursuant to Subsection (c), within thirty (30) days of receiving the *complete* application, the servicer must evaluate the application and determine all loss mitigation options available to the borrower and "[p]rovide the borrower with a notice in writing stating the servicer's determination of which loss mitigation options, if any, it will offer to the borrower on behalf of the owner or assignee of the mortgage."  *Id.* at § 1024.41(c).  Additionally, the servicer is prohibited from proceeding with a foreclosure sale until the servicer either (a) notifies the borrower of its decision regarding loss mitigation options, (b) the borrower rejects all loss mitigation options offered, or (c) the borrower fails to perform under an agreement on a loss

mitigation option.[7]  *See id.* at § 1024.41(g).  These provisions bear an effective date of January

10, 2014 (the "Effective Date").  *See* Mortgage Servicing Rules Under the Real Estate Settlement

Procedures Act (Regulation X), 78 Fed. Reg. 10696-01, 10696 (Feb. 14, 2013) ("This final rule

is effective on January 10, 2014.").

      Notwithstanding these mandates, "[n]othing in § 1024.41 imposes a duty on a servicer to

provide any borrower with any specific loss mitigation option."  *Id.* at § 1024.41(a).  However,

"[a] borrower may enforce the provisions of this section pursuant to section 6(f) of RESPA (12

U.S.C. 2605(f))."  *Id.*  Plaintiffs' claim is predicated primarily upon Ocwen's failure to evaluate

their application within the 30-day period prescribed by 12 C.F.R. § 1024.41(c) and its choice to

initiate foreclosure proceedings despite Plaintiffs' pending and complete application in

contravention to 12 C.F.R. § 1024.41(g).  *See* Compl. at ¶ 11, 17-19.[8]

### ii.    *Application of the Effective Date*

      The record evidence establishes that Plaintiffs' application was submitted on January 8,

2014, two days prior to Regulation X's Effective Date.  Thus, according to Ocwen, imposing

Regulation X's obligations would require retroactive application of the law, a highly detested

practice.  *See generally Vartelas v. Holder*, 132 S. Ct. 1479, 1486-87 (2012) ("Numerous

decisions of [the Supreme] Court repeat the classic formulation Justice Story penned for

determining when retrospective application of a law would collide with the doctrine.  It would do

so, Story stated, when such application would 'tak[e] away or impai[r] vested rights acquired

---

[7] Application of this provision is dependent upon whether the servicer initiated the foreclosure
process prior to submission of the complete application.  *See* 12 C.F.R. § 1024.41(g) ("If a
borrower submits a complete loss mitigation application after a servicer has made the first notice
or filing required by applicable law for any judicial or non-judicial foreclosure process . . . .").

[8] Plaintiffs also claim that Ocwen failed to comply with Regulation X's error resolution
procedures under 12 C.F.R. § 1024.35.  *See* Compl. at ¶ 20.  This issue is discussed *infra* Section
III.C.

under existing laws, or creat[e] a new obligation, impos[e] a new  duty, or attac[h] a new disability, in respect to transactions or considerations already past.'"); *Lindh v. Murphy*, 521 U.S. 320, 325 (1997)) ("Generally there is a traditional presumption against retroactivity, such that when the application of a statute to the conduct at issue would result in a retroactive effect and Congress has not specified the temporal reach of the statute, it is presumed that the statute does not apply to that conduct."); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) ("Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."); *Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994) ("[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic.").

The question presented is whether Plaintiffs' application, filed prior to the Regulation's Effective Date, triggers the servicer's obligations under the Regulation. Plaintiff contends that the relevant obligations under 12 C.F.R. § 1024.41 are only triggered upon the servicer's receipt of a "complete" or "facially complete" application, and because Plaintiffs' application was complete at some yet-to-be-determined point <u>after</u> the Effective Date, Ocwen was not free to avoid its duties under Regulation X.  Ocwen responds by claiming that Plaintiffs' contention is irrelevant, as the initial submission of an application after the Effective Date is a prerequisite to obtaining any protections under Regulation X.

The Court agrees that the language of 12 C.F.R. § 1024.41 imposes duties upon a servicer when it receives a "complete" or "facially complete" application.  *See* 12 C.F.R. § 1024.41(c), (g).  However, in order for a borrower to avail himself or herself of Regulation X's protections, the borrower's application must be received by the servicer after the Effective Date.   Thus, in

resolving this question of first impression, the Court holds that application of the Effective Date precludes this claim.

With any question of statutory interpretation, the Court presumes that Congress "says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992) (citing *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241-42 (1989)) (further citations omitted).  This inquiry becomes the sole inquiry where the words of the statute are unambiguous.  *Id.* (citations omitted).  Where "the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."  *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (internal quotation and citation omitted).

At issue here is not the language of the Regulation but, rather, the application of the Effective Date and whether it precludes all applications submitted before the effective date that thereafter become "complete".  Accordingly, reference to the legislative history is useful in this instance, and the Court turns to it in order to ascertain the CFPB's intent in selecting January 10, 2014 as the starting point for Regulation X's protections.  *See Polycarpe v. E&S Landscaping Serv., Inc.*, 616 F.3d 1217, 1224 (11th Cir. 2010) (citing *United States v. Fields*, 500 F.3d 1327, 1330 (11th Cir. 2007)) (noting that the use of legislative history, while generally avoided, "may become necessary where the statutory text is doubtful").  Additionally, the Court looks to statements by the CFPB as a source of persuasive authority.  *See Stern v. Int'l Bus. Machines Corp.*, 326 F.3d 1367, 1372 (11th Cir. 2003) (citing *Williams v. Wright*, 927 F.2d 1540, 1545 (11th Cir. 1991) (acknowledging that "the views of the agency entrusted with interpreting and enforcing [a statute] carry considerable weight"); *see also Polycarpe*, 616 F.3d at 1225 (citing *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000); *Pugliese v. Pukka Dev., Inc.*, 550 F.3d

1299, 1305 (11th Cir. 2008)) (stating that the court should "accord respect to the [regulatory agency's] views and give it weight as a source of persuasive authority").[9]

The January 10, 2014 Effective Date was not chosen haphazardly; rather, the CFPB sought to strike a balance between the needs of both servicers and borrowers:

> [The January 10, 2014 Effective Date] will ensure that consumers receive the protections in these rules as soon as reasonably practicable, taking into account the timeframes established by the Dodd-Frank Act, the need for a coordinated approach to facilitate implementation of the rules' overlapping provisions, and the need to afford covered persons sufficient time to implement the more complex or resource-intensive new requirements.

*See* Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 Fed. Reg. 10696-01, 10842 (Feb. 14, 2013) (hereinafter, "CFPB Final Rule and Official Interpretation").  In amendments made to Regulation X in October 2013, the CFPB once again reiterated that "the new regulations would apply to transactions for which applications were received on or after January 10, 2014." *See* Amendments to the 2013 Mortgage Rules Under the Equal Credit Opportunity Act (Regulation B), Real Estate Settlement Procedures Act (Regulation X), and the Truth In Lending Act (Regulation Z), 78 Fed. Reg. 60382-01, 60382 (Oct. 1, 2013) (hereinafter, "2013 Amendments").  Thus, it is evident that an application received by a servicer prior to the Effective Date does not activate the requirements under Regulation X.

This conclusion is further supported by review of a consumer advice report published by the CFPB shortly after Regulation X was implemented.  On January 28, 2014, the CFPB published a 104-page guide entitled "Help for Struggling Borrowers: A guide to the mortgage

---

[9] Pursuant to 12 U.S.C. § 2617(a), the CFPB is charged with implementing rules and regulations, and making relevant interpretations to achieve the purpose of RESPA.

servicing rules effective on January 10, 2014" (the "CFPB Guide" or "Guide").[10]  *See* CFPB,

Help for Struggling Borrowers: A guide to the mortgage servicing rules effective on January 10,

2014        (January        28,        2014)        (available        at

http://files.consumerfinance.gov/f/201402_cfpb_mortgages_help-for-struggling-borrowers.pdf)

(last visited November 12, 2015).  Although the CFPB Guide is non-binding,[11] it nevertheless

confirms the bright-line rule, advising consumers that "[t]he loss mitigation application rules

only apply to loss mitigation applications submitted on or after January 10, 2014."  *Id.* at 8, 12.

Moreover, a "loophole" noted by the Guide also reflects the intention to impose a bright-line rule

with respect to Regulation X.  The Guide states that "[t]he servicer must conduct this evaluation

even if the borrower previously filed for, was granted, or was denied a loss mitigation plan

before January 10, 2014."  *Id.* at 8.  Accordingly, a borrower who has previously submitted an

application and has been rejected, or who has a previously filed application outstanding, may

resubmit the application in order to avail themselves of the new Regulation.

By imposing an effective date of January 10, 2014, the CFPB intended to institute a clear

starting point with respect to when a servicer's obligations under Regulation X would be

triggered.  To conclude otherwise, as Plaintiffs suggest, would result in an unmanageable

regulatory regime.  Plaintiffs assert that an application submitted prior to the Effective Date that

becomes either complete or "facially complete" at some point subsequent to January 10, 2014,

---

[10] The Guide was originally published on December 13, 2013.  *See* CFPB, Help for Struggling
Borrowers: A guide to the mortgage servicing rules effective on January 10, 2014 (December 18,
2013)    (available    at    http://files.consumerfinance.gov/f/201312_cfpb_mortgages_help-for-
struggling-borrowers.pdf) (last visited October 22, 2015).

[11] The CFPB Guide itself notes its non-binding nature, stating that "it is not a substitute for the
rules" as "[o]nly the rules and their official interpretations can provide complete and definitive
information regarding their requirements."  CFPB Guide at 6.

triggers the servicer's obligations under Regulation X.  Various obligations are, in fact, triggered after the application is rendered either complete or facially complete, such as the duty to properly evaluate the application and the servicer's prohibition on the sale of the property, after the initial submission of an application.  *See* 12 C.F.R. § 1024.41(c), (g).  However, the *submission* of the application on or after January 10, 2014 is a prerequisite to obtaining these protections set forth in 12 C.F.R. § 1024.41.  A borrower may not essentially sidestep the Effective Date by claiming that the application, while submitted prior to the Effective Date, nevertheless requires a servicer to act under Regulation X at some indeterminate later date, when the borrower's application becomes complete.

As noted, the selection of the Effective Date was calculated and precise, the product of a thorough and deliberative process.  The CFPB received approximately sixty (60) comments from industry participants who, for the most part, requested a later effective date.  *See* CFPB Final Rule and Official Interpretation, 78 Fed. Reg. at 10842.  While the Bureau acknowledged the difficulties presented by imposing an effective date one year from issuance, the Bureau nonetheless concluded that implementation in twelve (12) months was practicable and established the effective date reflected in the Regulation.  *Id.*  ("[The comments] provide some basis to believe that implementing the regulations within 12 months is challenging for many firms.  They do not establish, however, that implementation in 12 months is impracticable.").  The Effective Date allowed servicers and other industry participants to adapt to the new regime and establish programs and policies to facilitate compliance.  *See id.*  In short, the one-year period was purposeful.

Accepting Plaintiff's interpretation would lead to a result not contemplated by Regulation X.  For example, were the servicer to receive a loss mitigation application months, not days,

prior to January 10, 2014, such as in November 2013, no obligations would be triggered related to the initial review of the application under 12 C.F.R. § 1024.41(b)(2), which are prompted by the mere receipt of an application. *See id.* (requiring servicer to "promptly" review the application if the application is "receive[d] . . . 45 days or more before a foreclosure sale"). Thus, the servicer would neither be required to review the application for completeness or inform the borrower of the additional documents and information required to make the application complete if it is determined that the original submission is lacking. *See id.* In short, the servicer would receive the application, but would not be required to comply with Regulation X, as the Regulation had not yet become effective. To hold that the obligation to review is prompted by the application's "complete" date, would require servicers to "reboot" any premature applications after the Effective Date when the servicer is provided "all the information that the servicer requires from a borrower in evaluating applications for the loss mitigation options available." *Id.* at § 1024.41(b)(1) (defining "complete loss mitigation application"). In short, servicers would be forced to audit applications already submitted prior to the Effective Date in order to determine whether they, at some later point, became complete. Stated simply, servicers would be required to monitor those applications which they are otherwise not required to monitor, negating the purpose of the Effective Date.

The initial review procedures under Subsection (b)(2) serve as a precursor to the evaluation requirements under Subsection (c). A servicer must first determine completeness and request any supplemental documentation necessary to make the application complete before either completeness or "facial completeness" can be attained.[12] *See id.* at § 1024.41(c)(2)(iv)

---

[12] Even under circumstances where the original application is complete upon its initial submission, the review procedures under Subsection (c) would still not be triggered if the application is submitted prior to the Effective Date.

(stating that "facial completeness" occurs when the borrower submits all missing documents and information as stated in the initial notice under § 1024.41(b)(2)(i)(B)).  Once the application is complete or facially complete, then, and only then, is the servicer required to evaluate the application within the 30-day window, provided that completeness is achieved "more than 37 days before a foreclosure sale."  *See id.* at § 1024.41(c)(1).  If the servicer's duty to ascertain completeness under Subsection (b) is not activated because the application is submitted prior to the Effective Date, then the aforementioned obligations, namely, those relevant to the evaluation of the application and prohibition on foreclosure sales, are not reached.   In other words, in order to reach the evaluation requirements under Subsection (c) and the prohibition on foreclosure sales under Subsection (g), the servicer must first determine completeness under Subsection (b).

The Court recognizes the seeming conflict this conclusion raises with respect to a prior decision rendered in this case.  *See* Order on Ocwen's Motion to Dismiss, ECF No. [21] (the "February 11th Order" or "Order") at 4-5.  Seeking dismissal of Plaintiffs' Complaint, Ocwen presented a nearly identical argument, to wit, that it was under no obligation to evaluate Plaintiffs' application subject to the terms and provisions of Regulation X, as the application was submitted prior to January 10, 2014.  *See* Motion to Dismiss, ECF No. [16] at 5.  Based on the fact that the Complaint failed to specify the precise date that the application had been submitted, this Court categorically rejected that contention.  *See* February 11th Order at 4-5 (recognizing that "the Complaint certainly does not state that the mitigation application was filed before January 10, 2014," and that "[i]t remains uncertain when the loss mitigation application was completed and submitted to [Ocwen]").   The Court also opined, in dicta, that Ocwen's interpretation appears to conflict with "the nature and purpose of [RESPA and Regulation X]," which, as a consumer protection statute, must be "construed liberally in order to best serve

14-cv-81522-BLOOM/VALLE

Congress' intent."   *Id.* at 6 (citing *McLean v. GMAC Mortgage Corp.*, 398 F. App'x 467, 471 (11th Cir. 2010)).  With the benefit of clarity regarding the application's submission date and a requisite thorough examination of Regulation X, the Court's prior conclusion regarding the applicability of Regulation X is negated by the discussion contained herein.  *See Carroll v. TheStreet.com, Inc.*, No. 11-CV-81173, 2014 WL 5474048, at *4-5 (S.D. Fla. Apr. 10, 2014) (noting that "[t]he law of the case doctrine precludes a court from reexamining issues decided upon an earlier appeal of the same case" but may "revisit prior decisions of its own or a coordinate court" at its discretion) (citations omitted).

Because Ocwen was under no obligation to review Plaintiffs' application at the point of its original submission under Regulation X, it had no continuing obligation to determine whether the application had achieved completeness.  Thus, there was no requirement that Ocwen review the application within the 30-day period provided by 12 C.F.R. § 1024.41(c), and Ocwen was free to proceed with the foreclosure sale without fear of violating 12 C.F.R. § 1024.41(g).  Consequently, Plaintiffs' claim for violations of 12 C.F.R. § 1024.41 fails as a matter of law, and the Court need not address the remaining bases for dismissal of this claim.[13]

---

[13] Ocwen has also argued that it was not required to service Plaintiffs' loan because the application was not complete thirty-seven (37) days prior to the foreclosure sale.  Section 1024.41(c) demands a servicer's compliance when the servicer receives a "complete loss mitigation application more than 37 days before [the] foreclosure sale."  12 C.F.R. § 1024.41(c)(1).  The CFPB's guidance on the issue affirms this bright-line rule: "a servicer is not required to comply with the requirements in § 1024.41 with respect to a loss mitigation application submitted 37 days or less before a foreclosure sale . . . ."  *See* 12 C.F.R. § 1024 (Supp.    I,    cmt.    41(g))    (Official    Bureau    Interpretations)    (available    at http://files.consumerfinance.gov/f/201301_cfpb_final-rule_servicing-respa-interpretations.pdf); *see also Deming-Anderson v. PNC Mortgage*, No. 15-CV-11688, 2015 WL 4724805, at *4 (E.D. Mich. Aug. 10, 2015) ("[The servicer] received [the application] fewer than thirty-seven days before the scheduled foreclosure sale on August 5, 2015, and was therefore under no obligation to review Plaintiff's applications.").  Because Ocwen was not required to evaluate Plaintiffs' application, the resolution of whether the application was completed thirty-seven days prior to the foreclosure sale is not necessary.

**C.     Plaintiffs' Claims Regarding Regulation X's Notice of Error Procedures**

"RESPA prescribes certain actions to be followed by entities or persons responsible for servicing federally related mortgage loans, including responding to borrower inquires." *McLean v. GMAC Mortgage Corp.*, 398 F. App'x 467, 471 (11th Cir. 2010) (citing 12 U.S.C. § 2605). Upon receipt of a qualified written request, the servicer must provide "a written response acknowledging receipt of the correspondence" within five (5) business days.   12 U.S.C. § 2605(e)(1)(A).  Within thirty (30) business days of receipt of the qualified written request, "the servicer must: (1) make appropriate corrections in the account of the borrower and transmit a written notification of such correction; (2) after conducting an investigation, provide the borrower with a written explanation that includes a statement of the reasons for which the servicer believes the account is correct, and the name and telephone number of an employee or department that can provide further assistance; or (3) after conducting an investigation, provide the borrower with a written explanation that includes the information requested by the borrower or an explanation of why the information requested is unavailable, along with the name and telephone number of an employee or department that can provide further assistance." *McClean*, 398 F. App'x at 471 (citing 12 U.S.C. § 2605(e)(2)).

Regulation X parrots these requirements.   Under Regulation X, when the servicer receives a qualified written request, it must acknowledge the receipt of the request within five (5) days and either: (1) "[p]rovid[e] the borrower with the requested information and contact information, including a telephone number, for further assistance in writing"; or (2) [c]onduct a reasonable search for the requested information and provid[e] the borrower with a written notification that states that the servicer has determined that the requested information is not available to the servicer, provides the basis for the servicer's determination, and provides contact

information, including a telephone number, for further assistance." 12 C.F.R. § 1024.36(d)(1).[14]

Additionally, Regulation X provides that the receipt of a "notice of error triggers the servicer's

obligation to conduct a reasonable investigation and provide the borrower with the following:

> a written notification that includes a statement that the servicer has determined that no error occurred, a statement of the reason or reasons for this determination, a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination, information regarding how the borrower can request such documents, and contact information, including a telephone number, for further assistance.

*Id.* at § 1024.35(e)(B).

### i.    *Ocwen Has Not Demonstrated Compliance Regarding Plaintiffs' NOE*

Ocwen believes that it has complied with its aforementioned duties.  Review of Ocwen's

October 14th Response to Plaintiffs' NOE reveals this is not the case.

Plaintiffs' NOE[15] clearly elucidates the purported error, to wit, that Ocwen "cited its own

failure to comply with the time limits in 12 C.F.R. § 1024.41 as the basis for its denial of [the

Plaintiffs] loan modification application."  *See* Plaintiffs' NOE at 2.  In other words, Plaintiffs

---

[14] Where the information requested is related solely to "the identity of, and address or other relevant contact information for, the owner or assignee of a mortgage loan," the servicer is required to respond within ten (10) business days.  12 C.F. R. § 1024.36(d)(2)(i)(A).  "For all other requests for information," the servicer is provided thirty (30) business days.  *Id.* at § 1024.36(d)(2)(i)(B).  For requests under § 1024.36(d)(2)(i)(B), the servicer may extend the thirty-day period by an additional fifteen (15) business days, if the servicer notifies the borrower of the extension in writing.  *Id.* at § 1024.36(d)(2)(ii).  Regulation X's error resolution procedures also allow a servicer to extend the response period by fifteen (15) days.  *See id.* at § 1024.35(e)(3)(ii).

[15] Plaintiffs' inquiry is ambiguously titled as a "Qualified Written Request/Notice of Error."  As indicated, a qualified written request and a notice of error are two distinct inquiries, which trigger particular requirements on the part of the servicer.  *See Wilson v. Bank of Am., N.A.*, 48 F. Supp. 3d 787, 800 (E.D. Pa. 2014) ("The new regulation delineates separate procedures for responding to a borrower's Notice of Error and a borrower's Request for Information.").  Although the letter is vague, the content of the letter states that it "shall serve as a 'Notice of Error' as that term is defined by 12 C.F.R. § 1024.35(a)."  Accordingly, it is treated as such.

claim that Ocwen hesitated on its review of Plaintiffs' application by requesting additional documents until it was too late, notwithstanding the fact that the application was either complete or, at a minimum, "facially complete," well within the prescribed time period. *See id.* Ocwen's response fails to address such concerns but simply directs Plaintiffs to the "denial letter for [the] denial reason." *See* Response to Plaintiffs' NOE at 1. In turn, the denial letter merely states that Plaintiffs' application was denied because it was, essentially, untimely. *See* Exhibit G, ECF No. [49-7] at 133 ("We are unable to offer a Home Affordable Modification because: As of the date of this letter your loan has a confirmed sale date within 7 days."). Ocwen acknowledges that this was the sole reason Plaintiffs' application was denied. *See* Ocwen's SOF, ECF No. [49] at ¶¶ 13-14 ("[P]laintiffs were sent letters informing them that their HAMP and proprietary modification requests were denied because the pending foreclosure sale was within seven business days."; "On March 10, 2014, [P]laintiffs were informed by telephone that their modification requests had been denied due to the pending sale date.").

This Court has previously reprimanded servicers who respond to inquiries with "standardized, impersonal, and impertinent language, which can only be viewed as a cut-and-paste of a generic and form-ready response." *See Russell v. Nationstar Mortgage, LLC*, No. 14-61977-CIV-BLOOM/VALLE, 2015 WL 5819663, at *7 (S.D. Fla. Oct. 6, 2015). Ocwen's nonchalant reference to the precise language which initially aroused Plaintiffs' frustrations was insufficient to indicate "the reason or reasons for [the servicer's] determination" that "no error occurred." *See* 12 C.F.R. § 1024.35(e)(1)(i)(B). In fact, Ocwen's consumer representative conceded that the Response to Plaintiffs' NOE did not explicitly address Plaintiffs' concern and was more akin to a "template" or "form letter":

> Q:      Can you show me where in this October 14th document
>          [Plaintiffs'] concerns are addressed?

26

A:     *They're not addressed specifically*, it's a reference to a modification determined by many factors and that it can be denied if the loan doesn't qualify for any or all of the above factors.

Q:     Is this a form letter.

A:     I would think that this would be a template type of document.  I don't know if that means a form letter in your mind, but they have a template.

Q:     When you say template, what does that mean to you?

A:     A pre-prescribed way of providing a written response to a particular request or concern.

Handville Depo. at 39:14-40:25.  The sending of a template or form letter which fails to substantively address concerns raised by the borrower's inquiry does not satisfy the servicer's obligations under Regulation X's error resolution procedures.  *See generally Russell*, 2015 WL 5819663, at *7 (noting that form responses, "standing alone, would not amount to an adequate explanation for an inability to provide requested information" under 12 U.S.C. § 2605); *Marais v. Chase Home Fin., LLC*, 24 F. Supp. 3d 712, 723-24 (S.D. Ohio 2014) (holding that "form letter with no individualized features" was insufficient to satisfy servicer's duty under 12 U.S.C. § 2605).

Ocwen's emphasis on their internal research procedures does nothing to render its response satisfactory.  Regardless of whether Ocwen vigorously researched the history of Plaintiffs' loan and related application, the operative inquiry is whether its response to Plaintiffs' attempt to initiate error resolution procedures was compliant with Regulation X and RESPA. The substance of Ocwen's letter fails to clarify how Ocwen made its determination that no error occurred, as was required under 12 C.F.R. § 1024.35(e)(1)(B).  *See Marais*, 24 F. Supp. 3d at 723-24 (stating that RESPA requires "some explanation" as to why the servicer believes the account is accurate and finding that servicer did not comply with RESPA where it "made no effort . . . to explain or clarify why it felt that [the borrower's] account was correct").  Moreover,

this vague answer calls into doubt Ocwen's contention that a reasonable investigation was conducted into the matter and Ocwen's representations that it *generally* complies with such requirements is insufficient to demonstrate, without question, that such procedures were followed in this case.  *See* Handville Deposition at 32:1-34:7 (noting the intense procedures adhered to upon receipt of a notice of error but indicating that he never spoke with the individual who handled Plaintiffs' correspondence); *Wilson v. Bank of Am., N.A.*, 48 F. Supp. 3d 787, 804 (E.D. Pa. 2014) ("The addition of the word 'reasonable' seemingly imposes a substantive obligation that is not satisfied by the mere procedural completion of some investigation followed by a written statement of reasons.") (citations omitted).

Based on review of the record evidence, it is clear that by using boilerplate, nonresponsive language in addressing Plaintiffs' NOE, Ocwen failed to comply with its obligations under RESPA and Regulation X, specifically, 12 C.F.R. § 1024.35.[16]

> ### ii.   The Evidentiary Record Does Not Plainly Contradict Plaintiffs' Allegations

According to Ocwen, Plaintiffs' allegations are directly controverted and undermined by their admissions and testimony.  A comparison of the record and the pleadings does reveal several inconsistencies, yet these disparities do not warrant final summary judgment.

Factual assertions contained within pleadings are generally "considered to be judicial admissions conclusively binding on the party who made them."  *White v. ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir.1983).  "Judicial admissions are not conclusive, however, if the court allows the party to withdraw the admission or if the underlying pleading is amended or withdrawn."  *Palm Beach Int'l, Inc. v. Salkin*, No. 10-60995-CIV, 2010 WL 5418995, at *6

---

[16] Plaintiffs also deny both that the October 14th Response to Plaintiffs' NOE was either sent or received.  *See* Plaintiffs' Response at 6 n.1.  The Court need not address the merits of this argument as it now finds that Ocwen is not entitled to judgment as a matter of law based on the substance of the Response.

(S.D. Fla. Dec. 23, 2010) (citation omitted).  Along similar lines, "[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."  *Van T. Junkins & Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).  Thus, a party may not avoid summary judgment by substituting previously rendered admissions and testimony with contradictory assertions of fact for the simple purpose of defeating summary judgment.  *See generally Local 472 of United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada v. Georgia Power Co.*, 684 F.2d 721, 724 (11th Cir. 1982) (finding no abuse of discretion in denying motion to amend where amendment "appear[ed] to be nothing more than an effort to avoid an adverse summary judgment ruling").

The allegations concerning Plaintiffs' NOE do not exist in stark contrast to Plaintiffs' admissions.  With respect to Plaintiffs' NOE, the Complaint alleges the following facts.  On September 4, 2014, Plaintiffs sent Ocwen a Qualified Written Request/Notice of Error, notifying Ocwen that it failed to comply with 12 C.F.R. § 1024.41 "and specifically invoking the error resolution procedures established by RESPA and Regulation X."  Compl. at ¶ 13; *see also* Plaintiffs' NOE.  As previously discussed, the letter alerted Ocwen to the fact that it failed to comply with its obligations under Regulation X by declining to review the application within the express time provided by the Regulation "and then relied on its own failure as the sole basis to deny [the] application."  *See* Plaintiffs' NOE at 2.  Accordingly, Plaintiffs claim that Ocwen "completely ignored its obligations under 12 C.F.R. § 1024.35, and completely failed to substantively respond to [Plaintiffs'] Qualified Written Request/Notice of Error."  *See* Compl. at ¶¶ 14, 21.  On the other hand, the record reveals that on September 12, 2014, Ocwen

acknowledged receipt of Plaintiffs' correspondence requesting research to be performed for the loan.  *See* September 12, 2014 Letter, ECF No. [49-10] at 7 ("Ocwen's Sept. 12th Letter"). Ocwen's September 12th Letter also indicates that a written response will be provided within twenty (20) days from the receipt of Plaintiffs' initial letter.  *Id.*  On October 4, 2014, Ocwen advised Plaintiffs that it was unable to respond within the aforementioned twenty-day period and was extending the period as it was permitted to do under RESPA.  *See* October 12, 2014 Letter, ECF No. [49-10] at 8.  Ten days later, on October 14, 2014, Ocwen responded, directing Plaintiffs to refer to the denial letter sent on March 10, 2014 for the denial reason.  *See* October 14, 2014 Letter, ECF No. [49-10] at 9 (hereinafter, "Response to Plaintiffs' NOE"); *see also* Facsimile Confirmation, ECF No. [49-11] (indicating that the Response to NOE was successfully faxed on October 15, 2014); Affidavit of Howard R. Handville dated July 7, 2015, ECF No. [49-12] at ¶¶ 4-5.

Thus, there exists a soft conflict with Plaintiffs' assertion that the Ocwen's response to their NOE was never received.[17]  Howver, this conflict is not so profound as to undermine the entirety of the Complaint and leave Ocwen blind as to what obligations it has allegedly evaded. This is particularly true in light of Plaintiffs' allegations that Ocwen did not *substantively* respond to the NOE, an allegation which is plainly supported by the record.  Accordingly, nothing in the record creates a conflict sufficient to deem Plaintiffs' allegations materially untrue.  To the contrary, as discussed in Section III.C.i., *supra*, Ocwen's Response to Plaintiffs' NOE was insufficient.  For the purposes of summary judgment, the record and the Complaint exist in harmony with respect to Plaintiffs' NOE.

---

[17] Plaintiffs' Response to the present Motion emphasizes their denial that the Response to Plaintiffs' NOE was sent or received.  *See* Pl. Resp. at 6 n.1.

**D.      Plaintiffs' Damages Claim Fails**

A loan servicer who fails to comply with RESPA and Regulation X faces damages in the form of "any actual damages caused by the failure, and up to $[2],000 in statutory damages if there is a pattern or practice of noncompliance with RESPA."   *McLean v. GMAC Mortgage Corp.*, 398 F. App'x 467, 471 (11th Cir. 2010) (citing 12 U.S.C. § 2605(f)).[18]  Thus, a plaintiff seeking to recover under RESPA must show that he or she "suffered actual damages or is entitled to statutory damages."   *Jackson v. Ocwen Loan Servicing, LLC*, No. 11-60560-CIV, 2012 WL 882493, at *2 (S.D. Fla. Mar. 14, 2012) (citing *Frazile v. EMC Mortg. Corp.*, 382 F. App'x 833, 836 (11th Cir. 2010)) (addressing elements of RESPA claim).   Ocwen contends that Plaintiffs' claims for actual and statutory damages are conclusory and otherwise unsupported by the evidence.  The Court addresses each in turn, speaking exclusively to the remaining RESPA claim concerning Plaintiffs' NOE.

*i.      Plaintiffs Are Not Entitled to Statutory Damages*

Plaintiffs' request for statutory damages must fail.  Statutory damages up to $2000 are available to a plaintiff who demonstrates "a pattern or practice of noncompliance."  *See* 12 U.S.C. § 2605(f)(1)(B).  "The courts have interpreted the term 'pattern or practice' in accordance with the usual meaning of the words."  *McLean*, 595 F. Supp. 2d at 1365 (citation omitted).  "The term suggests a standard or routine way of operating."  *Id.* (citation omitted).

With respect to Ocwen's repeated failures, Plaintiffs allege the following:

> [Ocwen's] failure to comply with any of its obligations under
> RESPA and Regulation X are not isolated incidents but rather
> represent a pattern or practice of noncompliance with RESPA.
> [Ocwen's] pattern and practice of non-compliance has recently

---

[18] Section 2605(f) was amended to reflect a maximum statutory damage award of $2,000.  *See* DODD–FRANK WALL STREET REFORM AND CONSUMER PROTECTION ACT, PL 111-203, 124 Stat. 1376, 2184 (July 21, 2010).

> resulted in action by the New York Department of Financial
> Services and the Consumer Financial Protection Bureau.
> [Ocwen's] pattern or practice of non-compliance with RESPA is
> due to systemic deficiencies which arise from [Ocwen's] failure to
> develop policies and procedures to comply with
> RESPA/Regulation X, to employ qualified personnel, to
> appropriately train, manage, and supervising its servicing
> employees, and a general failure to adequately invest in servicing
> infrastructure.   [Ocwen's] omissions are the consequence of
> decisions that [Ocwen] has made in order to enhance [Ocwen's]
> own profits at the expense of the borrowers whose loans [Ocwen]
> services.

Compl. at ¶ 27.  Although these allegations are undoubtedly not the threadbare allegations courts

are required to reject at the dismissal stage, here, Plaintiffs must introduce more than a scintilla

of evidence to prove their entitlement to statutory damages.  Plaintiffs have not met this burden.

Plaintiffs' sole reference to a "pattern" or "practice" that exists outside of their own

experience is an unidentified action taken by the New York Department of Financial Services

and the CFPB.  Yet Plaintiffs fail to provide the Court with even the most minimal information

concerning this regulatory action, aside from Ocwen being the target.  Not so much as a case or

reference number is provided.   Accordingly, Plaintiffs rest their case for statutory damages

almost exclusively on the conduct to which they themselves have been purportedly victim to.

This is inadequate to expose a "pattern or practice" and, therefore, Plaintiffs cannot recover

statutory damages as a matter of law.  *See McLean*, 595 F. Supp. 2d at 1365 (disallowing

statutory damages under RESPA where "plaintiffs [] presented no evidence of a standard or

institutionalized practice of noncompliance by [the servicer]").

### ii.    *Plaintiffs Have Not Demonstrated Actual Damages*

"Actual damages" includes pecuniary damages such as: "(1) out-of-pocket expenses

incurred dealing with the RESPA violation including expenses for preparing, photocopying and

obtaining certified copies of correspondence, (2) lost time and inconvenience, such as time spent

away from employment while preparing correspondence to the loan servicer, to the extent it resulted in actual pecuniary loss (3) late fees and (4) denial of credit or denial of access to full amount of credit line." *McLean*, 595 F. Supp. 2d at 1366. Analogizing RESPA to other consumer protection statutes and noting that RESPA itself is to be construed liberally in order to effectuate Congress's intent, the Eleventh Circuit has also found the term "actual damages" to encompass non-pecuniary harms such as emotional distress, as well as pain and suffering. *McLean*, 398 F. App'x at 471 (citations omitted). Although the term is also construed liberally, it is not without its limits: "the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a . . . violation occurred supports an award for compensatory damages." *Id.* (quoting *Akouri v. Fla. Dep't of Transp.*, 408 F.3d 1338, 1345 (11th Cir. 2005)). Additionally, the plaintiff must also establish "a causal link between the claimed damages and [the] [d]efendant's alleged RESPA violation." *Jackson*, 2012 WL 882493 at *2 (citing *Habib v. Bank of America Corp.*, No. 10–04079, 2011 WL 2580971, at *4 (N.D. Ga. Mar. 15, 2011); *McLean*, 595 F. Supp. 2d at 1368 ("[A] causal relationship must exist between the statutory violation and the alleged harm.") (citation omitted). A plaintiff "may establish causation through lay testimony on their emotional distress damages under RESPA." *McLean*, 595 F. Supp. 2d at 1370.

Ocwen contends that Plaintiffs have not introduced a shred of evidence to demonstrate actual damages and, as a result, no genuine issue of fact exists as to this essential element of Plaintiffs' claim.[19]

---

[19] Plaintiffs contend that Ocwen has impermissibly attempted to shift the burden on summary judgment. The Court disagrees with Plaintiffs' protestation. On summary judgment, the moving party shoulders the initial burden of showing the absence of a genuine issue of material fact.

Plaintiffs claim actual damages in the form of "attorney's fees and litigation costs expended in the state court foreclosure action, costs associated with their fruitless efforts to invoke the RESPA/Regulation X error resolution procedures and emotional distress."[20]   *See* Compl. at ¶¶ 26-27.  Plaintiffs rely on two pieces of evidence to support their damages claim: (1) Plaintiffs' deposition testimony; and (2) Plaintiff Maria Mantilla's Affidavit, which was submitted in opposition to Ocwen's Motion.  The Affidavit addresses damages in a mere two paragraphs and states that Plaintiffs have been forced to retain several attorneys to assist them while the loan modification application was pending.  Affidavit of Maria Mantilla in Opposition to Ocwen's MSJ, ECF No. [53-1] (hereinafter, "Mantilla Affidavit") at ¶¶ 6-7.  In total, Plaintiffs claim to have incurred "$13.56 in expenses for sending the correspondence to Ocwen via certified mail, return receipt requested . . . ."  *Id.*  Additionally, Plaintiffs claim that their deposition testimony is replete with references to the emotional harm suffered by virtue of Ocwen's failure to comply with RESPA and Regulation X.  Unfortunately for the Court,

---

*Shiver*, 549 F.3d at 1343.  After this burden is satisfied, the burden shifts to the non-moving party who "'must do more than simply show that there is some metaphysical doubt as to the material facts.'"  *Ray*, 327 F. App'x at 825 (quoting *Matsushita Elec. Indus. Co.*, 475 U.S. at 586).  In fact, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'"  *Id.* (quoting *Celotex*, 477 U.S. at 322).  In short, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in its favor.  *Shiver*, 549 F.3d at 1343.  Ocwen properly frames its argument concerning damages, demonstrating a dearth of facts, thereby transferring the burden to Plaintiffs who are then obligated to show, through evidence apart from the pleadings, facts which establish a genuine issue as to each pertinent element.  Ocwen does not require that Plaintiffs prove their damages; to the contrary, Ocwen merely requests that Plaintiffs introduce a modicum of evidence in support of their damages claim.  Such a request is undoubtedly proper at the summary judgment stage, but only after Ocwen has satisfied its initial burden.  *See Shiver*, 549 F.3d at 1343.

[20] Under their theory of negligence, Plaintiffs also claim entitlement to punitive damages for Ocwen's "systemic failure[] to comply with the obligations imposed by RESPA and Regulation X," believing that its "acts and omissions represent a willful disregard of Plaintiffs' known rights established by RESPA and Regulation X."  Compl. at ¶ 33.

Plaintiffs have opted to refer generally to such testimony and fail to divulge a single instance or citation to such testimony.  Nevertheless, the Court has thoroughly reviewed Plaintiffs' deposition testimony, which reveals that they have suffered notable emotional trauma.  Viewing this evidence in the light most favorable to Plaintiffs, the Court is tasked with determining its sufficiency.

Plaintiff Mantilla's deposition adequately chronicles the emotional injuries suffered:

> [B]y this point the whole process was very, very stressful. Combination of bills, unreliability, our lack of knowledge really how to proceed, the persistence of Ocwen repeatedly asking for the same documents over and over again.  My husband is a type one diabetic where he's insulin dependent. The stress caused him to have high blood sugar and then he dipped down to the low 30s. Multiple times we had to call rescue because he had low blood sugar so he went into convulsions.  Without trying to get too emotional about it, there are certain things that I really do have to go back and reference.

Mantilla Depo. at 85:10-22. Mantilla notes that the experience was "extremely overwhelming, stressful, traumatic, exhausting. . . .  I was just exhausted."  *Id.* at 110:18-111:2.  Continuing later, Mantilla further expands on the emotional trauma she and her husband, Lage, suffered:

> We have gone through a lot of emotional stress to the point where this part of our lives, as you even here as you're asking me to pull back information, I'm reliving that moment.  I'm reliving the fact that I don't know if I'm going to stay in my home, if I'm going to be evicted, what am I going to tell my daughter.  Her being afraid, mom, where are we going to go.  It's just so many things related to that.  My husband's diabetes, his type one diabetes affecting him. Having to call the paramedics, having to particularly resuscitate him.  He had a heart attack about two and a half years ago.  We didn't have health insurance at the time so the fear of what if something goes bad, what if something happens to my husband, what's going to happen to us.  And dealing with this it was almost to the point of insult. . . .  And it's just from a sexual standpoint between [my husband] and I, to an emotional connection, it has been extremely, extremely stressful.

*Id.* at 120:6-121:12.  Additionally, their experience with the loss mitigation process purported placed "a damper" on their marriage and forced them to seek counseling.  *Id.* at 120:1-4.

These statements clearly demonstrate the non-pecuniary harm suffered by Plaintiffs.  Yet, Ocwen asserts that Plaintiffs have failed to distinguish their stress and emotional harm, under the instant facts, from the harm arising from the foreclosure action itself.  The flaw in Plaintiffs' purported emotional harm is not the validity of its harm itself.  Instead, the concern is whether Plaintiffs have demonstrated the necessary causal link between the Ocwen's remaining alleged RESPA violation regarding Plaintiffs' NOE and the emotional harm suffered.  *See McLean*, 398 F. App'x at 471; *McLean*, 565 F. Supp. 2d at 1368; *Jackson*, 2012 WL 882493, at *2.

Review of Plaintiffs' claimed damages supports the conclusion that there is no causal link between Ocwen's failure to adequately respond to Plaintiffs' NOE and the emotional harm incurred.  Nevertheless, it is evident that the emotional trauma suffered by Plaintiffs is not exclusive to the foreclosure action.  Although Plaintiffs were not entitled to a loan modification under Regulation X, they were entitled to have their application timely reviewed.  When viewing the testimony in Plaintiffs' favor, Plaintiffs' emotional suffering was clearly exacerbated by the uncertainty surrounding their loan modification application and Ocwen's allegedly unnecessary delay.  That being said, there is no indication that any of Plaintiffs' emotional harm came as a result of Ocwen's failure to properly respond to Plaintiffs' NOE.

Plaintiffs' loss mitigation application was denied on March 9, 2014, and the foreclosure sale of their home proceeded as scheduled on March 13, 2014.  Plaintiffs sent their Notice of Error on September 4, 2014, and received a timely, albeit possibly inadequate, response on October 14, 2014.  Therefore, a temporal gap of approximately seven (7) months existed between the sale of Plaintiffs' home and Ocwen's alleged RESPA violation.  Plaintiffs could not

have possibly believed that the response to their NOE, seven months *after* the foreclosure sale, would have ameliorated the ultimate damage that they claimed to have suffered, to wit, the sale of their home.   *See Russell v. Nationstar Mortgage, LLC*, No. 14-61977-CIV, 2015 WL 5029346, at *7 (S.D. Fla. Aug. 26, 2015) (granting summary judgment where the plaintiffs made no connection between the emotional harm and the servicer's response to a written inquiry, concluding that, "[u]nder the circumstances presented, Plaintiffs did not sustain damages by Defendant's responses or lack thereof"); *see also Uppal v. Hosp. Corp. of Am.*, 482 F. App'x 394, 397 (11th Cir. 2012) (holding that plaintiff could not sustain employment retaliation claim where harm occurred prior to sending complaint of discrimination); *cf. In re Residential Capital, LLC*, 513 B.R. 446, 466 (Bankr. S.D.N.Y. 2014) (finding emotional distress sufficient where the plaintiff, "[f]aced with a maddening and admittedly unwarranted foreclosure, . . . got nothing but silence or misinformation from [their servicer]").   In fact, the entirety of Mantilla's narration of her emotional harm relates to Ocwen's failure to abide by the loss mitigation procedures under 12 C.F.R. § 1024.41.  *See* Mantilla Depo. at 85:10-22 (indicating that the stress was derived from the "unreliability, [Plaintiffs'] lack of knowledge really how to proceed, [and] the persistence of Ocwen repeatedly asking for the same documents over and over again").   Although Plaintiffs' allegations of emotional trauma are not conclusory, they indisputably are not tied to the RESPA violation left at issue.

What is left of Plaintiffs' damages claim is the $13.56 allegedly incurred by virtue of "sending the correspondence to Ocwen via certified mail, return receipt requested . . . ."[21]  *See* Mantilla Affidavit at ¶¶ 6-7.  This Court agrees with the conclusion reached in *Zaychick v. Bank*

---

[21] Plaintiffs also claim damages in the context of attorney's fees.  The attorneys were hired "to help [Plaintiffs] avoid the completion of the foreclosure process while [their] loan modification application was pending."  *See* Mantilla Affidavit at ¶ 6.  Accordingly, by Plaintiffs' own admission, these fees are unrelated to the sending of the Notice of Error.

*of Am., N.A.*, No. 9:15-CV-80336, 2015 WL 4538813 (S.D. Fla. July 27, 2015), wherein the Honorable Robin L. Rosenberg properly determined that "the costs incurred while preparing a qualified written request for information from a servicer cannot serve as a basis for damages because, at the time those expenses are incurred, there has been no RESPA violation." *Id.* (citing *Steele v. Quantum Serv. Corp.*, 12–CV–2897, 2013 WL 3196544 (N.D. Tex. June 25, 2013)). To hold otherwise would negate the element of actual damages entirely, for "every RESPA claim [would have] damages built-in to the claim." *Id.* (citing *Lal v. Amer. Home Serv., Inc.*, 680 F. Supp. 2d 1218, 1223 (E.D. Cal. 2010)); *cf. Burdick v. Bank of Am.*, No. 14-62137-CIV, 2015 WL 4555239, at *5 (S.D. Fla. July 28, 2015) (citing *Cezair v. JPMorgan Chase Bank, N.A.*, No. DKC 13–2928, 2014 WL 4295048, at *8 (D. Maryland Aug. 29, 2014)) (finding costs of post-violation communications recoverable under RESPA).  The costs of sending the correspondence *prior to* the alleged RESPA violation may not serve as evidence of actual damages.  *See* 12 U.S.C. § 2605(f)(1)(A) (allowing for recovery of "any actual damages to the borrower *as a result of*" the violation (emphasis added)).  As the record is devoid of damages bearing a causal relationship to Ocwen's purported failure to comply with 12 C.F.R. § 1024.35, an essential element of Plaintiffs' claim is lacking and no genuine issue of material fact exists.  Any claim for a violation of 12 C.F.R. § 1024.35 fails to exist under the facts, even when viewing those facts in the light most favorable to Plaintiffs.

**E.     Plaintiffs' Negligence Claim**

        Count II of the Complaint, Plaintiffs' negligence claim, is predicated upon Ocwen's breach of the duties imposed by RESPA and Regulation X.  *See* Compl. at ¶¶ 30-34 ("[Ocwen] negligently and repeatedly breached all of its duties under RESPA and Regulation X.").  Thus, Count I and Count II maintain a symbiotic relationship; if Count I fails, Count II must also

succumb.   Because Ocwen is entitled to judgment on Plaintiff claims under RESPA and Regulation X, Plaintiffs' negligence claim fails.[22]

## IV.    CONCLUSION

For the foregoing reasons, Defendant Ocwen Loan Servicing, LLC, is entitled to judgment as a matter of law on all claims.   It is, therefore, **ORDERED AND ADJUDGED** that

1.   Plaintiffs, John Lage and Maria Mantilla's Motion to Strike Defendant's Affidavit, **ECF No. [59]**, is **DENIED**.

2.   Defendant Ocwen Loan Servicing, LLC's Motion for Summary Judgment, **ECF No. [50]**, is **GRANTED**.

3.   Any other pending motions are hereby **DENIED AS MOOT**.

4.   In accord with Rule 58 of the Federal Rules of Civil Procedure, judgment will be entered by separate order.

**DONE AND ORDERED** in Miami, Florida, this 18th day of November, 2015.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:
Counsel of Record

---

[22] Consequently, the Court need not address the issue of punitive damages.